ATTORNEY GENERAL OF THE STATE OF NEW YORK
CONSUMER FRAUD AND PROTECTION BUREAU

_____

In the Matter of

Assurance No. <mark>_____</mark>

**Investigation by LETITIA JAMES,**
**Attorney General of the State of New York,** of

Leda Health, Inc., and Madison Campbell

        Respondents.

_____

## ASSURANCE OF DISCONTINUANCE

The Office of the Attorney General of the State of New York ("OAG") commenced an investigation pursuant to New York Executive Law § 63(12) and General Business Law §§ 349 and 350 into the marketing and sales practices of Leda Health, Inc. ("Leda Health") and its Chief Executive Officer, Madison Campbell (collectively, "Respondents") concerning its at-home sexual assault testing kits.

This Assurance of Discontinuance ("Assurance") contains the findings of the OAG's investigation and the relief agreed to by the OAG and Respondents.

### OAG's FINDINGS

*A. General*

1. Leda Health is a Delaware corporation that offers at-home sexual assault testing kits it calls "Early Evidence Kits" (the "Kits") as an alternative to a Sexual Assault Nurse Exam ("SANE Exam"), which involves a rigorous, multistep examination and evidence collection.

2. Madison Campbell and Liesel Vaidya co-founded Leda Health in 2019 in Brooklyn, New York. Leda Health was initially incorporated under the name "MeToo Kits

Company" ("MeToo Kits"). MeToo Kits' corporate charter was amended to change its name to Leda Health effective May 19, 2020.

3. From its inception until at least October 2023, Leda Health was headquartered at 370 Jay Street, Brooklyn, New York 11201. In October 2023, Leda Health opened an office in Pittsburgh, PA. Leda Health retains offices in Brooklyn, NY.

4. Campbell is Leda Health's Chief Executive Officer and has served in that role since Campbell incorporated MeToo Kits in April 2019.

5. Campbell has knowledge of and personally participated in the illegal, fraudulent, and deceptive business practices of Leda Health described herein. Campbell developed the concept for Leda Health's Kits, was involved in developing the contents of the Kits, and acts as a point of contact for investors in Leda Health and press inquiries related to Leda Health. She is heavily featured in Leda Health's social media posts, and uses her personal social media accounts to promote Leda Health. She also has traveled to college campuses across the country, including New York University, to personally solicit universities and sororities to partner with Leda Health in distributing Kits.

### B. SANE Exams

6. A SANE exam is a forensic medical exam offered at a hospital or clinic to survivors of sexual assault consisting of forensic evidence collection, a full medical exam, sexually transmitted infections ("STI") and pregnancy options, STI treatment, and treatment of physical injuries.

7. SANE exams are conducted by a trained medical professional who is either a sexual assault nurse examiner ("SANE") or a sexual assault forensic examiner ("SAFE"). To become a SANE or SAFE, an individual must receive intensive classroom and clinical training.

This training covers evidence collection, injury detection methods, chain of custody requirements, methods of avoiding re-traumatization and other topics related to both prosecution and meeting needs of sexual assault survivors.

8. When a survivor seeks out a SANE exam, the primary focus is assessing the survivor's immediate health care needs by providing a prompt, competent medical assessment which addresses physical injuries, need for trauma care and safety needs. The secondary focus of a SANE exam is the collection and preservation of evidence. This evidence collection includes documentation and treatment of any physical injuries that can be used in cases where a perpetrator raises a defense of consent. In New York, sexual offense evidence collection kits for the collection and preservation of sexual assault forensic evidence have been developed by the New York State Division of Criminal Justice Services, in conjunction with the New York State Department of Health and crime labs in New York State, and are provided at no cost to hospitals in the state.

9. In New York State a survivor's entire health care and evidentiary exam is conducted at their discretion and with their consent. A survivor may withdraw consent to the exam at any time and may choose to only complete certain parts of the medical exam, evidentiary exam, or medical treatment. New York requires that written, informed consent be obtained for medical care as well as for collection and storage of sexual assault evidence.

10. The evidence collected during a SANE exam includes, but is not limited, to clothing, foreign materials on body, hair, oral and anogenital swabs and smears, body swabs, blood and urine samples for possible alcohol/toxicology testing and blood or saliva samples for DNA analysis and comparison. Evidence collection during a SANE exam focuses on collecting as much evidence as possible to help reconstruct events of the survivor's assault and increase

likelihood of obtaining viable evidence. To achieve this, SANE and SAFE practitioners can utilize a variety of evidence collection tools and supplies to ensure no evidence is overlooked. These tools and supplies include, but are not limited to, tweezers, tape, nail clippers and scrapers, scissors, collection paper, saline solution or distilled water, extra swabs, sterile containers, envelopes, paper bags, and pens/pencils. Some hospitals may also have access to alternative light sources that can aid in examining a survivor's body, hair and clothing to scan for evidence not visible under traditional lighting.

11. To establish authenticity of samples collected during a SANE exam, and to best ensure their reliability in subsequent court proceedings, it is critical that an unbroken chain of custody is maintained. To do this, chain of custody records should demonstrate an unbroken chain of the movements of evidence from person to person and location to location. Proper chain of custody thus requires documentation of all persons who have had custody of the evidence and tracks the location of the evidence in chronological order from collection, custody of evidence by law enforcement, submission to and analysis by forensic laboratories and storage through to potential use of evidence in criminal prosecution. Anyone who handles the evidence as part of the chain of custody may be expected to testify in court as to their interaction with the evidence.

12. To ensure an unbroken chain of custody, the New York State Department of Health advises that a survivor, family member or support person should never be left alone with evidence or allowed to handle or transport evidence after it has been collected. Only those trained in and aware of chain of custody requirements should be permitted to handle and transport evidence in order to maintain accurate chain of custody records to establish authenticity of evidence that may be useful in a court of law.

13. DNA evidence collected during a SANE exam can be submitted to the Federal Bureau of Investigation's ("FBI") Combined DNA Index System ("CODIS") for comparison. CODIS is a computer software program that operates local, state, and national databases of DNA profiles from convicted offenders, unsolved crime scene evidence and missing persons. The national database of DNA evidence is known as the National DNA Index System ("NDIS") and is part of the CODIS system that contains all DNA profiles contributed by federal, state and local participating labs. DNA evidence entered into CODIS is compared to DNA profiles already present in the system. The comparison capabilities of the CODIS system is particularly critical to help identify and catch perpetrators of crimes such as sexual assault and rape, which are often committed serially through multiple acts of sexual violence.

14. DNA evidence collected from a sexual assault kit is eligible for entry into NDIS and comparison via the CODIS system if there is documentation that a crime was committed. Only sexual assault kits analyzed by a NDIS-approved lab are eligible for submitting the DNA evidence of an unknown person into CODIS. Private labs thus do not have access to NDIS and kits analyzed by private labs are generally not eligible for CODIS entry. Kits containing DNA evidence collected during a SANE exam, in contrast, are generally eligible for CODIS entry because the kits are sent either to law enforcement who in turn submits kits to a NDIS approved lab, or are submitted to a NDIS lab with which the hospital has an existing relationship.

15. Under New York State's Sexual Assault Victim Bill of Rights, a survivor is entitled to access a SANE exam at a hospital or clinic at no cost to them to collect evidence and provide certain medical care related to the sexual assault. If the survivor has health insurance or declines to use their health insurance then the survivor is instructed to inform the hospital or clinic to bill the New York Office of Victim Services.

16. Upon completion of a SANE exam, survivors are provided with resources regarding appropriate follow-up medical care to ensure that their physical and emotional needs are met following a sexual assault.

### C. *OAG's Prior Investigation of MeToo Kits*

17. In 2019, the OAG began an investigation into MeToo Kits' advertising of its at-home sexual assault kits, which it offered as a self-administered alternative to SANE exams.

18. The OAG sent a cease-and-desist letter dated September 11, 2019 that directed MeToo Kits to immediately cease and desist from advertising its product. As set forth in the letter, the OAG had serious concerns about a number of advertising omissions and representations, including that MeToo Kits' advertising (i) "fail[ed] to disclose that testing, evidence preservation, and other services are available for free in New York"; (ii) gave "the misleading impression that the evidence collected will be admissible in a court of law"; (iii) gave "the misleading impression that the evidence collected with [the] kit is all the evidence that could be collected concerning the assault"; (iv) "misleadingly suggests that survivors must involve law enforcement, which is not always the case"; and (v) gave the "misleading impression that individuals are somehow safer from sexual assault as a result of purchasing the kit."

19. MeToo Kits received correspondence from several other attorneys general raising similar concerns, including cease and desist letters from the attorneys general of Illinois, Kansas, Michigan, and Ohio.

20. On September 13, 2019, MeToo Kits provided notice to OAG that it had taken down its website in response to the concerns raised by OAG and other attorneys general and agreed to inform the OAG when its website went live again. At that time, MeToo Kits represented that it "has sold no products in any jurisdiction, to date."

21. On June 9, 2021 the OAG received notice from Leda Health that it intended to begin marketing its Kits on a new website on or after June 15, 2021.

### D. *Leda Health's Kits*

22. Leda Health's Kits contain: four swab boxes, a garment bag, an intake form, a pen, a vial of sterile water, resource card, a storage bag, a large shipping bag, tape, a pre-paid shipping label, and an instruction manual. The instructions contained in the Kit direct survivors to download Leda Health's companion app for "step-by-step" guidance and support from a "Virtual Care Team," but advises that forgoing the app is "[n]o problem" because "your kit includes everything you need to complete this process without the app."

23. Of the four swab boxes in the Kits, one box is provided for the survivor to collect a sample of their own DNA by rubbing swabs on the inside of their own mouth; two boxes are provided for collecting samples of the perpetrator's DNA by the survivor swabbing locations on their own body that came in contact with the bodily fluid of the perpetrator; and the fourth is provided as a backup set. Each swab box contains two swabs that survivors are instructed to use simultaneously to collect samples. The Kit instructs survivors who are unsure where they should use the limited number of swabs that "there are no right or wrong areas to swab"; to "try to think back to your assault and choose two areas that feel relevant to your experience"; and to "trust [their] instincts."

24. The Kits also contain a garment bag that a survivor can use to submit one article of clothing for testing at Leda Health's partner lab. Leda Health's instructions provide that survivors can "choose 1 garment to test for offender(s)' DNA (i.e. underwear)" that the survivor believes "may have come in contact with [their] offender(s)' DNA." The instructions describe the step of submitting a garment for testing as "optional."

25. Once the survivor has collected DNA using the swabs, placed any garment in the garment bag, and completed an intake form concerning details of the assault, Leda Health instructs survivors to either (1) drop off the Kit at a FedEx location using the prepaid shipping label and shipping bag for DNA testing at Leda Health's "partner lab"; (2) store the Kit for up to "5 years" in a "cool, dry, and secure place" of the survivor's choosing; or (3) bring the Kit to "a hospital or police station, and ask them to submit it for DNA testing."

26. The results from Leda Health's Kits are not available on CODIS and to date, have not ever been admitted as evidence in a criminal case.

### E. *Deceptive Marketing*

27. Leda Health's website, leda.co, and its social media advertising contain misleading claims regarding the: 1) admissibility of its Kits, 2) level of treatment provided to survivors who use its Kits, and (3) possession of the Kits as a deterrent to sexual assault.

#### i. **Admissibility of the Kits**

28. Leda Health's website and advertisements give the misleading impression that its Kits are as admissible as a kit used as part of a SANE exam.

29. For example, from at least July 2022 until at least February 2023, Leda Health's website contained a popup screen on its homepage that stated, among other things, that:

   a. "Leda Health's Early Evidence Kits are tested at our partner lab, which is ISO/IEC 17025 accredited. Our partner lab has experience testing sexual assault kits submitted by law enforcement, having results admitted in court, and testifying in court."

   b. "Leda Health does not guarantee admissibility of our Early Evidence Kits. This is based on the fact that all evidence is subject to admissibility scrutiny in court."

30. The consumer had to click the "x" on the popup in order to access the homepage, making this popup unavoidable.

31. By referencing its partner lab's experience with "having results admitted in court and testifying in court," this pop-up screen gives the impression that the results produced by Leda Health's partner lab are comparable to the results a survivor would obtain if they had their sexual assault exam performed at a hospital or clinic. Also, by stating that "all evidence is subject to admissibility scrutiny in court" Leda Health implies that there are not significant differences that would affect admissibility between its Kits and SANE kits performed at a hospital.

32. Leda Health has also advertised that "self-administered DNA collection has been accepted by law enforcement in sexual assault cases before, which means a prosecutor has vetted the self-collection process and can make their zealous argument for admissibility," which implies the admissibility of self-administered DNA collection in court.

33. Additionally, Leda Health has stated that allowing a survivor to collect evidence without needing an in-person exam "naturally increase[s] survivor reporting rates for sexual assault, in turn increasing prosecution rates," again implying that the Kits will be admissible in court and result in convictions.

34. These impressions are misleading because to date Leda Health's Kits have not been admitted as evidence in a criminal case, and several features of the Kits render them significantly less likely to be admissible as compared to evidence from a SANE exam.

35. These include that using the Kits as instructed results in (i) survivors with no background or training having to collect their own evidence instead of a trained professional; (ii) an evidence collection process that is significantly less comprehensive and thorough than a

SANE exam; (iii) evidence collection based on vague instructions such as "trust your instincts" when choosing bodily areas to swab; (iv) the lack of any process to reliably track and document a chain of custody; and (v) the survivor having to testify and likely be cross-examined as to their own interaction with the evidence during any subsequent court proceedings instead of relying on testimony from a trained SANE nurse.

    **ii.    Level of Treatment from the Kits**

36. Leda Health's advertising and website also misleadingly imply that Kits provide sexual assault survivors with a level of treatment and care that is comparable to the level provided by a SANE exam conducted by a trained medical professional.

37. For example, Leda Health's "About" webpage states that it "view[s] sexual assault through a survivor focused lens. We have developed resources such as self-administered DNA collection and sexual health testing in order to meet the needs of sexual assault survivors."

38. By stating that they have developed services to "meet the needs of sexual assault survivors," Leda Health misleadingly implies that a survivor can obtain access to all the treatment and resources they need following a sexual assault through use of its Kits.

39. This impression is misleading because using the Kits does not provide the professional treatment and support that a survivor would receive at a hospital or clinic. Unlike a survivor that obtains a SANE exam, a survivor who uses a Kit does not receive (i) a prompt, competent medical assessment to respond and treat physical injuries, need for trauma care and safety needs; or (ii) a rigorous, multistep examination and evidence collection conducted by a specifically trained professional; or (iii) information and connections to receive appropriate follow-up care. Moreover, as noted above, under New York law survivors are entitled to access the superior level of care provided through SANE exams at a hospital or clinic at no cost.

40.     In small print on the bottom panel of Leda Health's website there is a disclaimer that states that "Leda Health is not a medical care provider and does not claim to be a replacement for professional medical care. We encourage survivors to report any assault to law enforcement and to visit their nearest hospital for medical evaluation." This disclaimer is not sufficient to overcome the overall misleading message on Leda Health's website that Leda Health's services are a substitute for professional medical care.

### iii.    The Kits as a Deterrent to Sexual Assault

41.     Leda Health's advertisements also repeatedly imply that its Kit can be a deterrent for sexual assault and that survivors are somehow safer if they possess a Kit.

42.     For example, Leda Health's advertisements include statements such as "Protect Your Community with Leda" implying that partnering with Leda Health to access its Kits somehow makes communities safer.

43.     Campbell made similar claims in a video posted on Leda Health's social media that references the "staggering statistic that 1 in 4 college women will be a victim of sexual violence" and asks "can we protect them? 100%", again implying that Leda Health and its Kits can somehow protect college women against sexual violence.

44.     Leda Health has posted videos on its social media of Chief Strategy Officer, Illana Turko, speaking on a news station in Boston and claiming that Leda Health's Kits and toxicology kits can serve as a deterrent to sexual assault. In the videos posted Turko described how both kits can cause perpetrators to "think twice" before committing sexual assault.

45.     Leda Health has also stated that "self-use kits will be a vital private and accessible method to increase reporting and decrease rape," and that if survivors use its Kits "offenders

learn that rape is NOT a crime you can easily get away with, and incidence rates go down," which gives the misleading impression that the Kits will lead to higher conviction rates.

46. In its advertisements Leda Health also emphasizes that rape and sexual assault are violent crimes with the lowest rate of conviction in the United States. Leda Health's posts include statements that "out of every 1,000 sexual assaults 975 perpetrators will walk free," "995 out of 1,000 perpetrators will walk free. This is more than robberies and assault/battery crimes," "every 68 seconds someone is sexually assaulted in the US. Meanwhile only 25 out of every 1,000 perpetrators will go to prison," and "only 0.8% of assaults lead to conviction."

47. These statements are misleading in the context of Leda Health's advertising because Leda Health has no evidence to suggest that use of its Kits has or will increase prosecution rates for sexual assault or serve to decrease incident rates of sexual assault and rape. To the contrary, as described further above: (i) Leda Health's Kits have not been admitted as evidence in a criminal case, (ii) the Kits collect less evidence and in a less reliable way as compared to a SANE exam; and (iii) unlike a SANE exam, evidence collected from a Kit is not eligible for entry into the CODIS database.

48. OAG finds that Respondents' actions are in violation of Executive Law §63(12) and General Business Law §349 and §350.

49. Respondents neither admit nor deny the OAG's Findings.

50. The OAG finds the relief and agreements contained in this Assurance appropriate and in the public interest. THEREFORE, the OAG is willing to accept this Assurance pursuant to Executive Law § 63(15), in lieu of commencing a statutory proceeding for violations of New York Executive Law §63(12) and General Business Law §349 and §350 based on the conduct described above from June 15, 2021 through the effective date of the Assurance.

IT IS HEREBY UNDERSTOOD AND AGREED, by and between the Parties:

**RELIEF**

51. <u>General Injunction</u>: Respondents shall not engage, or attempt to engage, in conduct in violation of any applicable laws, including but not limited to New York Executive Law §63(12) and General Business Law §349 and §350.

52. <u>Programmatic Relief:</u>

    a. Respondents shall not sell, offer for sale or otherwise make available in the State of New York (i) the Kits; or (ii) any other sexual assault kit that is marketed or otherwise presented as over-the-counter, at-home, or self-collected or that in any manner indicates that the sexual assault kit may be used for the collection of evidence of sexual assault other than by law enforcement or a health care provider.

    b. Respondents shall implement the relief described in this paragraph within 30 days of the effective date of the Assurance (the "Effective Date").

53. <u>Oversight/Monitoring:</u>

    a. Respondents shall provide the OAG with a certification affirming their compliance with the requirements set forth in this Assurance, paragraph [xx] within 60 days of the Effective Date. This certification shall be in writing and be signed by (i) Respondent Campbell; and (ii) an appropriate authorized individual on behalf of Respondent Leda Health. Thereafter, a certification of compliance shall be submitted to the OAG on an annual basis for the following [3] years. In any case where the circumstances warrant, the OAG may require Respondents to file an interim certification of compliance upon thirty (30) days' notice.

54. <u>Penalties</u>:

   a. Respondents shall pay to the State of New York $500,000 in penalties. Payment shall be made in full within 5 business days of the Effective Date. Payment shall be made by wire transfer in accordance with instructions provided by OAG.

   b. Respondents shall pay to the State of New York a stipulated penalty of $5,000 for each and every default in the performance of any obligation required by this Assurance occurring after the Effective Date.

## MISCELLANEOUS

**<u>Subsequent Proceedings:</u>**

55. Respondents expressly agree and acknowledge that a default in the performance of any obligation under paragraphs xx-xx is a violation of the Assurance, and that the OAG thereafter may commence the civil action or proceeding contemplated in paragraph xx, supra, in addition to any other appropriate investigation, action, or proceeding, and that evidence that the Assurance has been violated shall constitute prima facie proof of the statutory violations described in paragraph xx, pursuant to Executive Law § 63(15).

56. In any subsequent investigation, civil action, or proceeding by the OAG to enforce this Assurance, for violations of the Assurance, or if the Assurance is voided pursuant to paragraph xx, the Respondents expressly agree and acknowledge:

   a. that any statute of limitations or other time-related defenses are tolled from and after the effective date of this Assurance;

   b. that the OAG may use statements, documents or other materials produced or provided by the Respondents prior to or after the effective date of this Assurance;

    c.    that any civil action or proceeding must be adjudicated by the courts of the State of New York, and that Respondents irrevocably and unconditionally waive any objection based upon personal jurisdiction, inconvenient forum, or venue.

57.    If a court of competent jurisdiction determines that any Respondent has violated the Assurance, such Respondent shall pay to OAG the reasonable cost, if any, of obtaining such determination and of enforcing this Assurance, including without limitation legal fees, expenses, and court costs.

58.    To the extent not already provided under this Assurance, Respondents shall, upon request by OAG, provide all documentation and information necessary for OAG to verify compliance with this Assurance and to effectuate the terms of this Assurance.

**Effects of Assurance:**

59.    Acceptance of this Assurance by OAG is not an approval or endorsement by OAG of any of Respondents' practices or procedures, and Respondents shall make no representation to the contrary.

60.    This Assurance is not intended for use by any third party in any other proceeding.

61.    All terms and conditions of this Assurance shall continue in full force and effect on any successor, assignee, or transferee of Respondents. Respondents shall cause this Assurance to be adopted in any such transfer agreement. No party may assign, delegate, or otherwise transfer any of its rights or obligations under this Assurance without the prior written consent of OAG.

62.    Nothing contained herein shall be construed as to deprive any person of any private right under the law.

63. Any failure by the Attorney General to insist upon the strict performance by Respondents of any of the provisions of this Assurance shall not be deemed a waiver of any of the provisions hereof, and the Attorney General, notwithstanding that failure, shall have the right thereafter to insist upon the strict performance of any and all of the provisions of this Assurance to be performed by the Respondents.

**Communications:**

64. All notices, reports, requests, and other communications pursuant to this Assurance must reference Assurance No. 24-XXX, and shall be in writing and shall, unless expressly provided otherwise herein, be given by hand delivery; express courier; or electronic mail at an address designated in writing by the recipient, followed by postage prepaid mail, and shall be addressed as follows:

If to Respondent Leda Health, to: [ ],

If to Respondent Campbell, to: [ ],

If to the OAG, to:

Office of the Attorney General of the State of New York
Bureau of Consumer Frauds and Protection
28 Liberty Street, 20th Floor
New York, NY 10005
Christian Reigstad, Assistant Attorney General

or in his absence, to the person holding the title of Bureau Chief, Consumer Frauds and Protection Bureau.

**Representations and Warranties:**

65. The OAG has agreed to the terms of this Assurance based on, among other things, the representations made to OAG by Respondents and their counsel and OAG's own factual

investigation as set forth in Findings, paragraphs (1)-(xx) above. Respondents represent and warrants that neither they nor their counsel have made any material representations to the OAG that are inaccurate or misleading. If any material representations by any Respondent or its counsel are later found to be inaccurate or misleading, this Assurance is voidable by the OAG in its sole discretion.

66. No representation, inducement, promise, understanding, condition, or warranty not set forth in this Assurance has been made to or relied upon by Respondents in agreeing to this Assurance.

67. Respondents represent and warrant, through the signatures below, that the terms and conditions of this Assurance are duly approved, and execution of this Assurance is duly authorized. Respondents shall not take any action or make any statement denying, directly or indirectly, the propriety of this Assurance, or expressing the view that this Assurance is without factual basis. Nothing in this paragraph affects Respondents' (i) testimonial obligations or (ii) right to take legal or factual positions in defense of litigation or other legal proceedings to which the OAG is not a party.

**General Principles:**

68. Nothing in this Agreement shall relieve Respondents of other obligations imposed by any applicable state or federal law or regulation or other applicable law.

69. Nothing contained herein shall be construed to limit the remedies available to the OAG in the event that any Respondent violates the Assurance after its Effective Date.

70. This Assurance may not be amended except by an instrument in writing signed on behalf of the Parties to this Assurance.

71. In the event that any one or more of the provisions contained in this Assurance shall for any reason be held by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, in the sole discretion of the OAG, such invalidity, illegality, or unenforceability shall not affect any other provision of this Assurance.

72. Respondents acknowledge that they have entered this Assurance freely and voluntarily and upon due deliberation with the advice of counsel.

73. This Assurance shall be governed by the laws of the State of New York without regard to any conflict of laws principles.

74. The Assurance and all its terms shall be construed as if mutually drafted with no presumption of any type against any party that may be found to have been the drafter.

75. This Assurance may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.

76. The Effective Date of this Assurance shall be the date signed by OAG.

DATED:_____, 2024    LETITIA JAMES
　　　　　　　　　　　　　　　　Attorney General of the State of New York
　　　　　　　　　　　　　　　　28 Liberty Street
　　　　　　　　　　　　　　　　New York, NY 10005


　　　　　　　　　　　　　　By:  _____
　　　　　　　　　　　　　　　　Christian Reigstad, Esq.
　　　　　　　　　　　　　　　　Assistant Attorney General,
　　　　　　　　　　　　　　　　Consumer Fraud and Protection Bureau

DATED:_____, 2024        MADISON CAMPBELL

_____
Madison Campbell

STATE OF _____ )
                                                          )        ss.:
COUNTY OF _____ )

     On this _____ day of _____, 20\_\_\_, Madison Campbell personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, appeared before the undersigned and acknowledged to me that he/she executed the within instrument by his/her signature on the instrument.

Sworn to before me this
_____ day of _____, 2024        _____
                                                                                           NOTARY PUBLIC

DATED:_____, 2024        LEDA HEALTH, INC.

                                                         By:   _____
                                                                   [Officer Name]
                                                                   [Title]

STATE OF _____ )
                                                          )        ss.:
COUNTY OF _____ )

     On the _____ day of _____ in the year _____ before me personally came [Officer Name] to me known, who, being by me duly sworn, did depose and say that he/she/they reside(s) in _____ [if the place of residence is in a city, include the street and street number, if any, thereof]; that he/she/they is (are) the [president or other officer or director or attorney in fact duly appointed] of the Respondent, Leda Health, Inc., the corporation described in and which executed the above instrument; that he/she/they know(s) the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by authority of the board of directors of said corporation, and that he/she/they signed his/her/their names(s) thereto by like authority.

Sworn to before me this
_____ day of _____, 2024

_____
NOTARY PUBLIC