UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION

LEDA HEALTH CORPORATION and MADISON
CAMPBELL,

                                        Plaintiffs,

- against -

MICHELLE HENRY, in her official capacity as Attorney
General of Pennsylvania, and LETITIA JAMES, in her
official capacity as Attorney General of New York,

                                        Defendants.

Civ. Action No. 24-879 (CB)

DEFENDANT LETITIA JAMES'S PROPOSED
POST-HEARING FINDINGS OF FACT AND CONCLUSIONS OF LAW

LETITIA JAMES
Attorney General
State of New York
28 Liberty Street
New York, New York 10005
(212) 416-6287

ROSEMARY B. BOLLER
HALEY L. HAWKINS
Assistant Attorneys General
*of Counsel*
(Admitted *pro hac vice*)

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION AND PROCEDURAL HISTORY ....................................................................1

PROPOSED FINDINGS OF FACT ...........................................................................................4

   I.    Leda Health's Business, Location, and Current Operations ...................................4

   II.   Leda Health's Kits ...............................................................................................7

   III.   The NYAG's Investigation of Leda Health and Ms. Campbell ...........................9

     A.   The NYAG Letter ........................................................................................10

     B.   The NYAG Subpoena ...................................................................................11

     C.   The Draft AOD ...........................................................................................12

     D.   The Parties' Interactions Following the Draft AOD ....................................15

PROPOSED CONCLUSIONS OF LAW ...................................................................................16

   I.    This Court Lacks Personal Jurisdiction Over the NYAG ...................................17

   II.   This Court Lacks Subject Matter Jurisdiction Over the Claims Against the NYAG .........23

   III.   The Western District of Pennsylvania is an Improper Venue as to the NYAG .................28

   IV.   Plaintiffs Are Not Entitled to Preliminary Injunctive Relief .............................29

     A.   Plaintiffs Are Not Likely to Succeed on the Merits ....................................30

     B.   Plaintiffs Have Not Shown Irreparable Harm Absent a Preliminary Injunction .............38

     C.   The Equities and Public Interest Weigh in the NYAG's Favor....................41

CONCLUSION ....................................................................................................................44

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Freedom Forge Corp.*,
   204 F.3d 475 (3d Cir. 2000)................................................................................38

*Adams v. Ross Twp.*,
   No. 20-CV-355, 2021 WL 972520 (W.D. Pa. Mar. 16, 2021)...........................35

*Anderson v. Davila*,
   125 F.3d 148 (3d Cir. 1997)................................................................................39

*Arneault v. O'Toole*,
   864 F. Supp. 2d 361 (W.D. Pa. 2012)................................................................25

*Artway v. Att'y Gen. of State of N.J.*,
   81 F.3d 1235 (3d Cir. 1996)................................................................................42

*B & G Prods. Co. v. Vacco*,
   No. 98-CV-2436, 1999 WL 33592887 (D. Minn. Feb. 19, 1999) .....................23

*Backpage.com, LLC v. Dart*,
   807 F.3d 229 (7th Cir. 2015)...............................................................................37

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 66 (1963)..............................................................................................37

*Berry Coll., Inc. v. Rhoda*,
   No. 13-CV-115, 2013 WL 12109374 (N.D. Ga. June 12, 2013) ........................23

*Blackstone v. Richter*,
   No. 12-CV-1786, 2015 WL 3756164 (W.D. Pa. June 16, 2015) (Bissoon, J.)...................5

*Bolger v. Youngs Drug Prods. Corp.*,
   463 U.S. 60 (1983)..............................................................................................31

*Caplan v. Fellheimer Eichen Braverman & Kaskey*,
   68 F.3d 828 (1995) .........................................................................................38–39

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
   447 U.S. 557 (1980)............................................................................. 31, 33, 37–38

*Centimark Corp. v. Lavine,*
No. 11-CV-0757, 2011 WL 2941214 (W.D. Pa. June 20, 2011) ......................................18

*Christian Legal Soc'y v. Walker,*
453 F.3d 853 (7th Cir. 2006).........................................................................................39

*Conchatta, Inc. v. Evanko,*
83 F. App'x 437 (3d Cir. 2003).....................................................................................39

*CT Install Am., LLC v. Boryszewski,*
No. 22-CV-4557, 2023 WL 3306537 (E.D. Pa. May 8, 2023) ................................. 38, 40

*D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.,*
566 F.3d 94 (3d Cir. 2009) ...........................................................................................17

*D.J. v. Univ. of Iowa Hosps. & Clinics,*
No. 22-CV-752, 2024 WL 3254253 (W.D. Pa. June 30, 2024) (Bissoon, J.) ..................17

*Defense Distributed v. Grewal,*
971 F.3d 485 (5th Cir. 2020).....................................................................................20–21

*Doe v. Banos,*
713 F. Supp. 2d 404 (D.N.J. 2010) ...............................................................................40

*Dwyer v. Cappell,*
762 F.3d 275 (3d Cir. 2014) .........................................................................................33

*Edenfield v. Fane,*
507 U.S. 761 (1993)......................................................................................................43

*Elliott Reihner Siedzikowski & Egan, P.C. v. Pa. Emps. Benefit Trust Fund,*
29 F. App'x 838 (3d Cir. 2002)....................................................................................24

*Elrod v. Burns,*
427 U.S. 347 (1976)..................................................................................................38–39

*Eurofins Pharma U.S. Holdings v. BioAlliance Pharma S.A.,*
623 F.3d 147 (3d Cir. 2010) .........................................................................................18

*Ferring Pharm., Inc. v. Watson Pharm., Inc.,*
765 F.3d 205 (3d Cir. 2014) .........................................................................................29

*Fres-co Sys. USA, Inc. v. Hawkins,*
690 F. App'x 72 (3d Cir. 2017)................................................................................. 30, 41

*Gary v. F.T.C.*,
   526 F. App'x 146 (3d Cir. 2013) ........................................................................21

*Gen. Elec. Co. v. Deutz AG*,
   270 F.3d 144 (3d Cir. 2001) ..............................................................................17

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011) ...........................................................................................18

*Google, Inc. v Hood*,
   822 F.3d 212 (5th Cir. 2016) .............................................................................25

*Greater Phila. Chamber of Com. v. City of Philadelphia*,
   949 F.3d 116 (3d Cir. 2020) ..............................................................................31

*Heffner v. Murphy*,
   745 F.3d 56 (3d Cir. 2014) ................................................................................42

*Herman v. Hosterman*,
   No. 11-CV-898, 2011 WL 4974184 (M.D. Pa. Oct. 19, 2011) ........................35

*Hohe v. Casey*,
   868 F.2d 69 (3d Cir. 1989) ........................................................................ 38, 40

*Hufnagel v. Ciamacco*,
   281 F.R.D. 238 (W.D. Pa. 2012) .......................................................................18

*Ibanez v. Fla. Dep't of Bus. & Pro. Regul., Bd. of Acct.*,
   512 U.S. 136 (1994) ...........................................................................................32

*In re Diet Drugs*,
   282 F.3d 220 (3d Cir. 2002) ..............................................................................17

*In re R.M.J.*,
   455 U.S. 191 (1982) ...........................................................................................33

*In re Texas E. Transmission Corp. PCB Contamination Ins. Coverage*,
   15 F.3d 1230 (3d Cir. 1994) ..............................................................................17

*Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*,
   326 U.S. 310 (1945) ...........................................................................................18

*Issa v. Sch. Dist. of Lancaster*,
   847 F.3d 121 (3d Cir. 2017) ..............................................................................29

*Jaffery v. Atl. Cnty. Prosecutor's Off.*,
   695 F. App'x 38 (3d Cir. 2017) ........................................................................42

*Juzwin v. Asbestos Corp., Ltd.*,
   900 F.2d 686 (3d Cir. 1990) ....................................................................... 42–43

*Kehm Oil Co. v. Texaco, Inc.*,
   537 F.3d 290 (3d Cir. 2008) ............................................................................18

*Kennedy v. Warren*,
   66 F.4th 1199 (9th Cir. 2023) ..........................................................................37

*Kentucky v. Graham*,
   473 U.S. 159 (1985) ..........................................................................................1

*Koch v. Acker, Merrall & Condit Co.*,
   18 N.Y.3d 940 (2012) ......................................................................................33

*Lanin v. Borough of Tenafly*,
   515 F. App'x 114 (3d Cir. 2013) ......................................................................38

*Lauren W. ex rel. Jean W. v. DeFlaminis*,
   480 F.3d 259 (3d Cir. 2007) ............................................................................36

*Leda Health Corporation v. Inslee, et al.*,
   24-CV-871 (W.D. Wa.) .....................................................................................27

*Leone v. Cataldo*,
   574 F. Supp. 2d 471 (E.D. Pa. 2008) ...............................................................18

*Leroy v. Great W. United Corp.*,
   443 U.S. 173 (1979) ................................................................................... 28–29

*Matter of People v. Applied Credit Card Sys. Inc.*,
   27 A.D.3d 104 (N.Y. App. Div. 3d Dep't 2005) ...............................................33

*Media Matters for Am. v. Paxton*,
   No. 24-CV-147, 2024 WL 1773197 (D.D.C. Apr. 12, 2024) ..................... 20–21

*Mirabella v. Villard*,
   853 F.3d 641 (3d Cir. 2017) .......................................................................30, 34

*National People's Action v. Wilamette*,
   914 F.2d 1008 (7th Cir. 1990) .........................................................................39

*New Dana Perfumes Corp. v. The Disney Store, Inc.,*
    131 F. Supp. 2d 616 (M.D. Pa. 2001) .................................................................. 40

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................................ 29, 42

*Noonan v. Kane,*
    504 F. Supp. 2d 387 (E.D. Pa. 2020) ............................................................. 34–35

*NRA v. Vullo,*
    602 U.S. 175 (2024) ............................................................................................. 37

*O'Connor v. Sandy Lane Hotel Co., Ltd.,*
    496 F.3d 312 (3d Cir. 2007) ........................................................................... 17–18

*Okwedy v. Molinari,*
    333 F.3d 339 (2d Cir. 2003) ................................................................................ 37

*Oswego Laborers Local 214 Pension Fund v. Marine Midland Bank,*
    85 N.Y.2d 20 (1995) ............................................................................................ 33

*Peachlum v. City of York, Pa.,*
    333 F.3d 429 (3d Cir. 2003) ................................................................................ 24

*Persico v. Sebelius,*
    919 F. Supp. 2d 622 (W.D. Pa. 2013) ................................................................ 23

*Plavin v. Grp. Health Inc.,*
    857 F. App'x 83 (3d Cir. 2021) ........................................................................... 32

*Presbytery of N.J. of Orthodox Presbyterian Church v. Florio,*
    40 F.3d 1454 (3d Cir. 1994) ........................................................................... 24–26

*R.C. Maxwell Co. v. Borough of New Hope,*
    735 F.2d 85 (3d Cir. 1984) .................................................................................. 37

*Reading Health Sys. v. Bear Stearns & Co.,*
    900 F.3d 87 (3d Cir. 2018) .................................................................................. 16

*Revell v. City of Jersey City,*
    394 F. App'x 903 (3d Cir. 2010) ..................................................................... 34–35

*Roman Catholic Diocese v. Cuomo,*
    592 U.S. 14 (2020) .............................................................................................. 38

*Safari Club Int'l v. Salazar*,
    852 F. Supp. 2d 102 (D.D.C. 2012) ...................................................................39

*Salvation Army v. Dep't of Cmty. Affs. of State of N.J.*,
    919 F.2d 183 (3d Cir. 1990) ...........................................................................24

*Shotton v. Pitkin*,
    No. 15-CV-241, 2015 WL 5091984 (W.D. Okla. Aug. 28, 2015) ....................22

*Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*,
    549 U.S. 422 (2007) ........................................................................................16

*Smart Commc'ns Holding, Inc. v. Global Tel-Link Corp.*,
    No. 21-CV-1708, 2022 WL 1049319 (M.D. Pa. Apr. 7, 2022) .......................40

*Stanton-Negley Drug Co. v. Pa. Dep't of Pub. Welfare*,
    07-CV-1309, 2008 WL 1881894 (W.D. Pa. Apr. 24, 2008) ...........................28

*Starbucks Corp. v. McKinney*,
    144 S. Ct. 1570 (2024) ....................................................................................29

*Step-Saver Data Sys., Inc. v. Wyse Tech.*,
    912 F.2d 643 (3d Cir. 1990) ...........................................................................24

*Stilp v. Contino*,
    743 F. Supp. 2d 460 (M.D. Pa. 2010) ............................................................43

*Stroman Realty, Inc. v. Wercinski*,
    513 F.3d 476 (5th Cir. 2008) ........................................................ 18, 22–23, 42

*Suppan v. Dadonna*,
    203 F.3d 228 (3d Cir. 2000) ...........................................................................35

*Tait v. City of Philadelphia*,
    639 F. Supp. 2d 582 (E.D. Pa. 2009) .............................................................24

*Temple of the Lost Sheep Inc. v. Abrams*,
    930 F.2d 178, 184 (2d Cir. 1991) ...................................................................41

*Texas v. United States*,
    523 U.S. 296 (1998) ........................................................................................24

*Thomas v. Indep. Twp.*,
    463 F.3d 285 (3d Cir. 2006) ............................................................. 31, 34, 36

*Time Share Vacation Club v. Atlantic Resorts, Ltd.*,
    735 F.2d 61 (3d Cir. 1984) ................................................................................ 18

*Trs. of Gen. Assembly of Lord Jesus Christ of Apostolic Faith, Inc. v. Patterson*,
    527 F. Supp. 3d 722 (E.D. Pa. 2021) .................................................................. 17

*Twitter, Inc. v. Paxton*,
    56 F.4th 1170 (9th Cir. 2022) ................................................................... 24–25, 27

*U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*,
    898 F.2d 914 (3d Cir. 1990) .......................................................................... 31–32

*Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co.*,
    75 F.3d 147 (3d Cir. 1996) ................................................................................ 18

*Wearly v. Fed. Trade Comm'n*,
    616 F.2d 662 (3d Cir. 1980) .............................................................................. 25

*Williams v. Pa. Dep't of Corrs.*,
    No. 18-CV-170, 2020 WL 5237606 (W.D. Pa. Aug. 14, 2020) ..................... 26, 35

*Wilson v. Garcia*,
    471 U.S. 261 (1985) .......................................................................................... 24

*WinRed, Inc v. Ellison*,
    581 F. Supp. 3d 1152 (D. Minn. 2022) ............................................................. 23

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................................ 29, 41

*World-Wide Volkswagon Corp. v. Woodson*,
    444 U.S. 286 (1980) ..................................................................................... 22–23

*Wyrough & Loser, Inc. v. Pelmor Labs, Inc.*,
    376 F.2d 543 (3d Cir. 1967) .............................................................................. 17

*Zaloga v. Borough of Moosic*,
    841 F.3d 170 (3d Cir. 2016) .......................................................................... 34–35

*Zimmerlink v. Zapotsky*,
    539 F. App'x 45 (3d Cir. 2013) ......................................................................... 36

## U.S. Constitution

First Amendment ............................................................................................... passim

Fourteenth Amendment ............................................................................................. 1, 18, 22

Due Process Clause .................................................................................................. 18, 22

**Federal Statutes**

28 U.S.C.
    § 1391(b)(2) ........................................................................................................28

42 U.S.C.
    § 1983 ..................................................................................................................24

**State Statutes**

42 Pa. Cons. Stat.
    § 5524(2) .............................................................................................................24

42 Pa. Cons. Stat.
    § 5322(b) .............................................................................................................18

N.Y. Executive Law
    § 63(12) .................................................................................................... 25, 33, 42

N.Y. General Business Law
    § 349 .......................................................................................................... 33, 42
    § 349(c) ..............................................................................................................26
    § 350 .......................................................................................................... 33, 42

WA Revised Code
    § 5.70.070 ...........................................................................................................27

**Rules**

Fed. R. Civ. P. 4(j)(2)(B) ...........................................................................................18

Fed. R. Civ. P. 12 ........................................................................................................2

Fed. R. Evid. 201 .........................................................................................................5

N.Y. C.P.L.R.
    § 2308(b) .............................................................................................................25
    § 2308(b)(1) ........................................................................................................41
    § 7803..................................................................................................................41

**Other Authorities**

Black's Law Dictionary (12th ed. 2024)..................................................................................................32

Maryland Attorney General Report to Governor Wes Moore and the Maryland General
Assembly From the Sexual Assault Evidence Kits Policy and Funding Committee on
HB758/SB789, "Sexual Assault Evidence Kits – Preservation and Storage," December 1,
2023,

    https://mgaleg.maryland.gov/cmte_testimony/2024/jpr/1NfXL_mGQVbQuhLprASyI
R3Yatw4hbDZP.pdf...................................................................................................................5

Leda Health's website, www.leda.co ……………………………………………………4, 12

Wright & Miller, *Fed. Prac. & Proc.* § 3806 …………………………………………………...28

Defendant Letitia James, in her capacity as Attorney General of the State of New York ("AG James") and head of the New York Attorney General's Office ("NYAG"),[1] respectfully submits these Proposed Post-Hearing Findings of Fact and Conclusions of Law pursuant to the Court's August 27, 2024 Order (ECF 52).

## INTRODUCTION AND PROCEDURAL HISTORY

On June 17, 2024, Plaintiffs Leda Health Corporation ("Leda Health" or the "Company") and Madison Campbell filed the Complaint (ECF 1) against Attorney General James and the Attorney General of Pennsylvania ("PAAG"), as well as a Motion for a Preliminary Injunction ("PI Motion") (ECF 2) claiming that the NYAG's investigation into Plaintiffs' marketing and sale of the Leda Health "Early Evidence Kits" (the "Kits") violated their "core political speech." Pls.' PI Mot. (ECF 2) at 18. The primary relief Plaintiffs seek is a declaration "that Defendants' coercive threats violate the First and Fourteenth Amendments of the U.S. Constitution." Compl. at 20–21. Plaintiffs also seek a preliminary and permanent injunction restraining Defendants from making "unconstitutional threats" against Plaintiffs. *Id.*

As to the NYAG, Plaintiffs allege that her September 2019 cease-and-desist letter and May 2024 settlement proposal to Plaintiffs were unconstitutionally retaliatory and coercive. Plaintiffs filed their motion for preliminary injunction almost five years after the issuance of the NYAG's cease-and-desist letter. Plaintiffs did not file an Order to Show Cause or seek a temporary restraining order in conjunction with their motion, and their preliminary injunction papers did not explain their delay in seeking relief.

---

[1] Plaintiffs sue AG James in her official capacity only. An official-capacity suit "is *not* a suit against the official personally," but rather "is to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Thus, we refer to the Defendant herein as the NYAG.

On July 2, 2024, the Court held a status conference call to discuss Plaintiffs' PI Motion. In response to the Court's inquiry, all parties indicated that no discovery was necessary prior to the Hearing. *See generally* Transcript of July 2, 2024 Scheduling Conference (ECF 41) ("July 2, 2024 Tr."). During the conference call, the NYAG's counsel informed the Court of the NYAG's intent to challenge the Court's personal jurisdiction over the NYAG, as well as the Court's subject matter jurisdiction over the claims asserted against the NYAG. *See id.* 4:4–5, 4:22–5:1, 5:6–9. By Order dated July 2, 2024, the Court scheduled an evidentiary hearing as to Plaintiffs' PI Motion (the "Hearing"), and instructed Plaintiffs to address Defendants' Rule 12 arguments at the Hearing. *See* Order (ECF 24). On July 30, 2024, the NYAG filed its Motion to Dismiss the Complaint based on lack of personal jurisdiction, lack of subject matter jurisdiction, improper venue, and failure to state a claim as to the claims asserted against the NYAG. *See* NYAG Mot. (ECF 30). Later that same day, the NYAG filed its Opposition to Plaintiffs' PI Motion. *See* NYAG PI Opp'n (ECF 34).

The NYAG also filed a Motion to Modify the July 2, 2024 Scheduling Order, asking the Court to determine its Motion to Dismiss before conducting a hearing on the PI Motion. *See* ECF 32. In response, Plaintiffs argued that no adjournment was warranted because the NYAG "waived any objections to personal jurisdiction." ECF 40 at 1.

By Order dated August 6, 2024, the Court denied the NYAG's Motion to Modify, and rejected Plaintiffs' arguments that the NYAG had waived its personal jurisdiction defense, deeming it preserved. *See* Order (ECF 43). Specifically, the Court held that the NYAG

> has preserved any and all positions regarding lack of jurisdiction. Plaintiffs' arguments regarding waiver are rejected . . .. Having been afforded the benefit of a prompt Hearing, Plaintiffs cannot fairly maintain that participation constitutes a waiver. That position is rejected, and the NYAG's participation at the Hearing is made with all jurisdictional arguments preserved.

*Id.*

The Hearing was conducted on August 26, 2024. Plaintiffs called two witnesses in their case in chief, Ms. Campbell, the owner of Leda Health, and Ms. Teresa Devitt-Lynch, a member of Leda Health's "Care Team" who testified as an expert in the areas of forensic nursing and sexual assault exams. August 26, 2024 Hearing Transcript ("Tr.") 95:13–20.[2] Defendant Henry also called two witnesses, including Amanda Ringold, a nurse practitioner, who is also a Sexual Assault Nurse Examiner ("SANE") and a forensic coordinator at the University of Pittsburgh. Tr. 124:25–125:8, 126:24–127:1. Ms. Ringold testified as an expert in the field of sexual assault forensic examination. *See* Tr. 127:17–22. Defendant Henry also called Jennifer DiGiovanni, a Deputy District Attorney for the Allegheny County District Attorney's Office, who supervises the child abuse and crimes against persons units. *See* Tr. 166:5–9. Ms. DiGiovanni testified as an expert in the field of criminal prosecution of sexual assaults. *See* Tr. 165:15–24.

The NYAG relied upon a declaration by Laura J. Levine, the Deputy Bureau Chief of the NYAG's Consumer Frauds and Protection Bureau. The Levine Declaration was submitted in connection with the NYAG's Opposition to the PI Motion and in support of the jurisdictional and forum-related issues set forth in the NYAG's Motion to Dismiss. Prior to the Hearing, the parties agreed that they did not object to the admissibility or authenticity of any documents submitted in connection with the parties' respective motion papers. Those documents that were marked as exhibits were admitted into evidence by the Court. Tr. 84:15–21.[3]

At the Hearing, the NYAG reiterated its position that the Court lacked personal jurisdiction over the NYAG and subject matter jurisdiction over the claims asserted against the NYAG, and

---

[2] The transcript of the Hearing has not yet been entered on the docket. *See* Notice of Filing of Official Transcript (ECF 53).

[3] The NYAG's exhibits are marked as DNY-1 through DNY-26 and will be referenced as such herein. A copy of the NYAG's Exhibit List submitted to the Court and parties at the Hearing is annexed hereto as Exhibit "A."

requested that the Court grant the NYAG's Motion to Dismiss. Tr. 20:1–21:10, 88:25–89:3. The Court reserved decision on the NYAG's motion. Tr. 89:4.

Pursuant to an Order dated August 27, 2024, the Court directed the parties to submit proposed findings of fact and conclusions of law. *See* Order (ECF 52).

## PROPOSED FINDINGS OF FACT

### I.    Leda Health's Business, Location, and Current Operations

1.    Plaintiff Leda Health Corporation ("Leda Health" or the "Company"), formerly known as "MeToo Kits Company," is a for-profit business incorporated in the State of Delaware. DNY-26 ¶ 1; Compl. ¶ 11. Plaintiff Madison Campbell is a co-founder and the Chief Executive Officer of Leda Health. Compl. ¶¶ 11–12; Tr. 25:3–5.

2.    The Company was founded in Brooklyn, New York in 2019, with an office location at 370 Jay Street, Brooklyn, New York, 11201 (the "Brooklyn Location"). *See* DNY-1 ¶¶ 7, 12; DNY-8 at 66; DNY-11 at 78. The Brooklyn Location was Leda Health's sole office location from 2019 through at least Fall 2023. *See* DNY-1 ¶¶ 5–7, 11–12, 14, 19–20; DNY-20. Plaintiffs conceded this at the Hearing. *See* Tr. 85:6–13, 86:18–23, 87:2–4.

3.    Ms. Campbell averred that "Leda Health seeks to offer comprehensive support services to sexual assault survivors." Declaration of Madison Campbell ("Campbell Decl.") (ECF 2-1) ¶ 8; *see also* PL-6 at 4 (stating that Leda Health offers services "designed to meet the needs of survivors").

4.    Through Leda Health's website, www.leda.co, the Company describes itself as being "built for survivors, by survivors," and advertises, markets, and offers for sale products and services to organizations, including universities, sororities, and hospitals, for eventual use by individual members of such organizations. *See* PL-6 at 11; DNY-11 at 5–7.

5.      The principal product promoted by Leda Health is an at-home sexual assault testing kit it calls an "Early Evidence Kit" (the "Kit" or "Kits"). *See* Tr. 25:14–18, 26:2–3; PL-6 at 2–3, 11.

6.      The sole purpose of the Kit is to enable a survivor of sexual assault to collect evidence of the assault for use in a legal proceeding. *See* Tr. 25:14–18.

7.      To date Plaintiffs have not sold a Kit directly to a consumer. Plaintiffs instead sell the Kits to organizations, with the understanding and intent that those organizations will provide the Kits to consumers. *See* Tr. 31:20–32:18 (describing the Leda Health business model pertaining to the Kits).

8.      Plaintiffs market their Kits as an alternative method of evidence collection for survivors who do not wish to obtain a Sexual Assault Forensic Examination ("SAFE") at a hospital. *See* Tr. 25:10–13.

9.      Ms. Campbell has characterized sexual assault as a "multi-billion-dollar industry" in pitches to obtain venture capital funding. *See* DNY-23 at 3.[4]

10.     Since its inception, the Company has raised almost $10 million in venture capital. *See* DNY-23 at 2.

11.     In 2019, Leda Health entered into a contract with the New York State Empire State Development ("ESD"), committing to maintain its business location in New York State through 2025. *See* Declaration of John R. Glover ("Glover Decl."), Ex. A (ECF 46-1) at 2.

---

[4] *See also* Maryland Attorney General Report to Governor Wes Moore and the Maryland General Assembly From the Sexual Assault Evidence Kit Policy and Funding Committee on HB758/SB789, "Sexual Assault Evidence Kits – Preservation and Storage," December 1, 2023, at 14 ("Maryland Report") https://mgaleg.maryland.gov/cmte_testimony/2024/jpr/1NfXL_mGQVbQuhLprASyIR 3Yatw4hbDZP.pdf, ("In February 2023, MeToo Kits' founder, Madison Campbell, characterized the publicity surrounding the kits as the kind of press 'people pay tons of money for.' She additionally characterized sexual assault as a 'multi-billion dollar industry' at a Bay-area pitch accelerator event."). Because the Maryland Report is publicly available on the website of the Maryland General Assembly, the Court may take judicial notice of the information considered by the legislative committee. Fed. R. Evid. 201; *see Blackstone v. Richter*, No. 12-CV-1786, 2015 WL 3756164, at *3 (W.D. Pa. June 16, 2015) (Bissoon, J.).

12.     At some time in Fall 2023, Leda Health opened an office in Pittsburgh, with a business address at 3803 Butler Street, Pittsburgh, Pennsylvania, 15201 (the "Pittsburgh Location"). *See* DNY-20 at 195–96; PL-6 at 18. Through at least December 2023, the Brooklyn Location was the only location referenced on the Company website. *See* DNY-1 ¶ 20.

13.     At all times relevant to this case prior to Fall 2023, Ms. Campbell resided outside of Pennsylvania. *See* Tr. 43:21–44:5. Ms. Campbell currently resides in Pittsburgh. *See* Tr. 43:24–25.

14.     According to Ms. Campbell, Leda Health's Pittsburgh Location is now the company's "headquarter[s]." Tr. 44:6–8.

15.     As of the Hearing Date, the Brooklyn Location remains listed on the Leda Health website's "Contact Us" page. *See* Tr. 85:19–25, 86:6–8; PL-6 at 18. The "Contact Us" page does not identify either location as the Company's "headquarters." *See* PL-6 at 18.

16.     As of the Hearing Date, the Leda Health website's "User Agreement," as well as the User Agreement contained in its Instruction Manual provide that any dispute with Leda Health "will be resolved through binding arbitration" and that "[s]uch arbitration will be administered by the American Arbitration Association ('AAA') in accordance with the rules of the AAA, and any arbitration hearing will be held in New York, New York." PL-3 at 48, ¶ 22; PL-6 at 33, ¶ 23; DNY-17 ¶ 23.

17.     The User Agreement on the Leda Health website and in the Leda Health Instruction Manual further provides that the services referenced in Leda Health's terms and conditions "are operated by Leda Health, 370 Jay Street, 7th Floor, Brooklyn, New York 11201." PL-3 at 48; PL-6 at 34, ¶ 23; DNY-17 at 48, ¶ 22.

18.     Leda Health's Chief of Staff, Jacob Madden, still resides in New York and conducts business on behalf of Leda Health from New York. *See* Tr. 90:4–18, 90:23–25.

6

19.     The Leda Health "Care Team" advertised or promoted on the website and referenced in the Kits currently consists of eight individuals retained by Leda Health as independent contractors. *See* Tr. 109:6, 112:20. The members of the Care Team are located at various locations in the United States, including North Dakota. *See* Tr. 66:11–14, 118:23–24. None of the Care Team members is located in Pittsburgh. *See* Tr. 44:9–10 (Ms. Campbell and "consultants" may work from Pittsburgh office).

**II.     Leda Health's Kits**

20.     Leda Health's Kits contain: a resource card, a physical instruction manual, three sets of swabs and one back-up set, an intake form, a vial of sterile water, a pen, tape, a garment bag, a storage bag, a shipping bag, and a pre-paid shipping label. *See* PL-3 at 9.

21.     The instructions contained in the Kit direct survivors to download Leda Health's companion app for "step-by-step" guidance and support from a "Virtual Care Team," *id.* at 6, but advise that forgoing the app is "[n]o problem" because "your kit includes everything you need to complete this process without the app[,]" *id.* at 8.

22.     Of the four swab sets in the Kits, one is provided for the survivor to collect a sample of their own DNA by rubbing swabs on the inside of their own mouth, *see id.* at 10, 31; two are provided for collecting samples of the perpetrator's DNA by the survivor swabbing locations on their own body that came in contact with the bodily fluid of the perpetrator, *see id.* at 10, 15–28; and the fourth is provided as a back-up set, *see id.* at 9. Each swab set contains two swabs that survivors are instructed to use simultaneously to collect samples. *See id.* at 13–14.

23.     The Kit instructs survivors who are unsure where they should use the limited number of swabs that "there are no right or wrong areas to swab[,]" *id.* at 12; to "try to think back to your assault and choose two areas that feel relevant to your experience[,]" *id.* at 11; and to "trust [their] instincts[,]" *id.* at 12.

24.     The Kits also contain a garment bag that a survivor can use to submit one article of clothing for testing at Leda Health's partner lab. *See id.* at 9. Leda Health's instructions provide that survivors can "choose 1 garment to test for offender(s)' DNA (i.e. underwear)[,]" *id.* at 35, that the survivor believes "may have come in contact with [their] offender(s)' DNA," *id.* at 33. The instructions describe the step of submitting a garment for testing as "optional." *Id.* at 33–34, 36.

25.     Once the survivor has collected DNA using the swabs, placed any garment in the garment bag, and completed an intake form concerning details of the assault, Leda Health instructs survivors to either (1) drop off the Kit at a FedEx location using the pre-paid shipping label and shipping bag for DNA testing at Leda Health's "partner lab[,]" *id.* at 40; (2) store the Kit for up to "5 years" in a "cool, dry, and secure place" of the survivor's choosing, *id.* at 41; or (3) bring the Kit to "a hospital or police station, and ask them to submit it for DNA testing[,]" *id.*

26.     The swabs contained in the Kits are manufactured by Puritan Medical Products in Oregon, and the Kits are assembled in either Oregon or Maine. *See* Tr. 31:3–7, 31:14–16; DNY-23 at 1.

27.     The Federal Bureau of Investigation's Combined DNA Index System ("CODIS") is a computer software program through which law enforcement can compare DNA evidence collected from an unknown person who committed a sexual assault against national databases of DNA profiles. *See* Tr. 73:25–74:4, 203:22–204:6; DNY-26 ¶¶ 13–14. Law enforcement personnel use CODIS to identify unknown perpetrators of sexual assault. *See* Tr. 183:25–184:19, 203:22–24.

28.     Leda Health's "Partner Lab," DNA International, is located in Florida. *See* Tr. 34:17–21, 38:17–20.

29.     Data collected from Leda Health's Partner Lab is not eligible for CODIS entry. Tr. 74:5–19.

30.    According to Ms. Campbell, from the inception of the Company through the Hearing Date, approximately 5,000 Kits have been assembled. *See* Tr. 31:24–32:3.

31.    As of the Hearing Date, fewer than 100 Kits have been distributed in the United States. *See* Tr. 48:24–49:4.

32.    As of the Hearing Date, only one Kit has been tested at Leda Health's Partner Lab. *See* Tr. 49:16–20.

33.    Plaintiffs are not aware of a single instance where evidence collected with a Kit has been admitted into evidence in any civil or criminal proceeding. *See* Tr. 78:19–23, 122:13–16; DNY-23 at 1.

34.    As reflected in a February 4, 2024 Pittsburgh Post Gazette press article, Leda Health's forensic advisor, Chief Operating Officer, and its Partner Lab all agreed that, at present, the Kits "cannot be used as evidence at trial." DNY-23 at 1.

III.    **The NYAG's Investigation of Leda Health and Ms. Campbell**

35.    In 2019, press reports concerning Plaintiffs' Kits attracted the attention of several sexual assault experts and survivor advocacy groups, as well as the attorneys general of several states. *See* DNY-1 ¶ 5; DNY-2 at 2–4.

36.    Numerous organizations issued statements opposing the Kits, including the National District Attorney's Association, the Pennsylvania Coalition to Advance Respect, and the International Association of Forensic Nurses. *See* Tr. 82:19–83:3.

37.    Additionally, Leda received correspondence from several state attorneys general raising concerns about the misleading and deceptive nature of Leda's marketing of the Kits, including cease-and desist letters from the attorneys general of Illinois, Kansas, Michigan, and Ohio. DNY-1 ¶ 8; PAAG PI Opp'n, Exs. A–H (ECF 38-1–38-8); Tr. 81:12–20.

38.     The NYAG opened its investigation into Plaintiffs' conduct in September 2019 after becoming aware of potentially deceptive marketing of the Kits by Plaintiffs in violation of New York state consumer protection law. *See* DNY-1 ¶¶ 5–6; DNY-3 at 1–3; NYAG PI Opp'n (ECF 34) at 3–5.

39.     The NYAG attorneys responsible for work conducted on the NYAG's investigation into Plaintiffs' conduct are based in the New York City office of the NYAG, located at 28 Liberty Street, New York, New York, 10005. *See* DNY-1 ¶ 4.

40.     In connection with the NYAG's investigation of Plaintiffs' conduct, none of the NYAG attorneys who worked on the investigation travelled to Pennsylvania; retained or contracted with any person or entity in Pennsylvania; communicated with any consumers in Pennsylvania; or sought information or documents, whether by letter request or formal process, from any person or entity known by the NYAG to reside in Pennsylvania. *Id.* ¶ 4. Plaintiffs offered no evidence otherwise.

## A.     The NYAG Letter

41.     On September 11, 2019, the NYAG sent the Letter to Leda Health's Brooklyn Location. *See* DNY-1 ¶ 6; DNY-3; Tr. 85:6–9.

42.     The Letter solely concerned misleading marketing statements pertaining to Plaintiffs' Kits. *See* DNY-3.

43.     Plaintiffs claim that the Letter objected to Leda's "'overall message' that survivors can use alternative service to what the government offers." *See, e.g.,* Compl. ¶ 47; Pls.' PI Mot. (ECF 2) at 24. That mischaracterizes the Letter's contents. The "overall message" language Plaintiffs quote from the Letter stated only that a disclaimer on Leda Health's website "is insufficient to contradict the overall message of [their] advertisement" misleadingly indicating that "the evidence will be admissible in court." DNY-3 at 2.

10

44.    Plaintiffs took no steps to challenge the Letter despite having the opportunity to do so under New York law. *See generally id.*; *see also* NYAG PI Opp'n (ECF 34) at 3–5.

45.    In September 2019, following the NYAG's issuance of the Letter, and after receiving cease-and-desist letters from numerous other states' attorneys general, Plaintiffs took down the Leda Health website. *See* DNY-1 ¶ 9; DNY-8. But in or around June 2021, Plaintiffs reinstated the Leda Health website. *See* DNY-1 ¶ 12; DNY-11.

46.    Plaintiffs initiated the instant litigation in June 2024, almost five years after the NYAG sent the Letter. *See* DNY-1 ¶¶ 5–6; DNY-3 at 1–3.

**B.    The NYAG Subpoena**

47.    On January 24, 2023, the NYAG attempted to serve an investigative subpoena (the "Subpoena") at Leda Health's Brooklyn Location. *See* DNY-1 ¶ 15. On February 3, 2023, Plaintiffs' outside counsel later accepted service of a revised version of the Subpoena by email. *See id.* ¶¶ 15–16. Plaintiffs' sole office location was still in Brooklyn, New York at this time. *See id.* ¶ 20; Tr. 87:2–4.

48.    Plaintiffs took no steps to challenge the Subpoena despite having the opportunity to do so under New York law. *See* DNY-1 ¶ 17; *see also* NYAG PI Opp'n (ECF 34) at 3–5.

49.    In response to the Subpoena, Leda Health voluntarily produced thousands of documents over a period of more than 13 months. *See* DNY-1 ¶ 17.

50.    In October 2023, the NYAG learned from press reports that Leda Health was planning to open a second office in Pittsburgh. *See id.* ¶ 20; DNY-20.

51.    At no point during the investigation did Leda Health or its counsel advise the NYAG that Leda Health had an office in Pennsylvania. *See* DNY-1 ¶ 19. Plaintiffs offered no evidence otherwise.

52.    The NYAG has never directly contacted Leda Health or Ms. Campbell at Leda Health's Pittsburgh address. *See id.* ¶ 20. Plaintiffs offered no evidence otherwise.

C.    The Draft AOD

53.    Following review of Plaintiffs' productions, the NYAG provided Plaintiffs with the Draft AOD to serve as a starting point for negotiations over a possible consensual resolution to the NYAG's investigation. *See* DNY-1 ¶ 22.

54.    Plaintiffs have asserted that "Ms. Campbell was a Pittsburgh resident when [the NYAG] sent the AOD to her, demanding she sign it." ECF 46 at 11. Plaintiffs offered no evidence supporting this assertion. To the contrary, the evidence establishes that, on May 31, 2024, the NYAG (i) sent the draft AOD via email to the national law firm that had been representing Plaintiffs since the outset of the investigation, and (ii) solicited comments on the draft. DNY-1 ¶ 23; DNY-25; DNY-26; Tr. 87:17–24.

55.    The Draft AOD was explicitly labeled "DRAFT- Confidential Settlement Communication." DNY-26. It constitutes a draft voluntary offer of settlement from the NYAG, which required both parties' assent to be binding and enforceable. *See id.*

56.    The proposed AOD reflected the NYAG's understanding that Leda Health was founded in New York and had maintained an office location in New York for the entirety of the investigation. *See id.* ¶ 3. The proposed injunctive relief contained in the Draft AOD was explicitly limited to business activity "in the State of New York." *See id.* ¶ 52. The Draft AOD proposed an oversight provision requiring Leda to periodically certify compliance with the New York-limited proposed injunctive relief. *See id.* ¶ 52. The draft AOD also proposed a New York choice-of-law clause. *See id.* ¶ 73. Additionally, the draft AOD proposed a stipulated $500,000 penalty based on the NYAG's preliminary finding that Leda Health had violated various New York consumer protection laws. *See id.* ¶ 54.

57.    The Draft AOD contained preliminary findings that Plaintiffs' marketing of the Kits on "Leda Health's website, leda.co, and its social media advertising contain misleading claims,"

including regarding the: (1) admissibility of its Kits, (2) level of treatment provided to survivors who use its Kits, and (3) possession of the Kits as a deterrent to sexual assault. *Id.* ¶ 27; *see id.* ¶¶ 28–47. To date, Plaintiffs have not specifically challenged those findings. The evidence presented in connection with Plaintiffs' PI Motion supported them.

> a.   *Plaintiffs misleadingly imply that the Kits are as admissible as evidence collected through a SAFE*

58.    As part of their marketing of the Kits, Plaintiffs state that admissibility of the Kits is not guaranteed because "all evidence is subject to admissibility scrutiny in court[,]" thus equating the likelihood of admissibility and acceptance in court of the Kits with other types of evidence—including evidence collected through a SAFE. PL-6 at 52 (stating in a pop-up page produced by clicking on the "Learn More" link at the bottom of the main web page that "Leda Health does not guarantee admissibility of our Early Evidence Kits" and that "[t]his is based on the fact that all evidence is subject to admissibility scrutiny in court"); DNY-26 ¶ 29(b); Tr. 40:2–5 ("[Plaintiffs] wanted to talk about how evidence is generally admissible, not just our kits, but any evidence could be admissible[.] . . . We cannot guarantee anything.").

59.    SANEs are subject to extensive and rigorous training and certification. In conducting forensic examinations of survivors, SANEs are knowledgeable regarding the collection, chain of custody, and storage requirements necessary to preserve evidence of a sexual assault for a potential legal proceeding. *See* Tr. 127:2–13, 128:4–11, 130:11–22, 133:18–21.

60.    Maintaining chain of custody involves multiple steps, including the SANE "sign[ing], [ ] initial[ing], [and] seal[ing]" the collected evidence, the crime lab testing the evidence, and "the police writ[ing] follow-up reports regarding their collection or involvement [in] where the evidence moves" in order to ensure that "[e]verything is documented along the way on the actual kit[.]" Tr. 174:17–24.

61.    In contrast, Plaintiffs' Kits are designed to be used by survivors with no background or training in evidence collection, and have never been admitted into evidence in a criminal or civil

legal proceeding. *See* Tr. 78:19–23. Even the anatomical illustrations contained in the Kits' instruction manual, intended to guide the survivor as to where to swab for evidence, are deficient and misleading to a lay person. Tr. 142:10–25, 143:1–5.

62.    Evidence obtained with Plaintiffs' Kits is unlikely to be admitted in a criminal proceeding and, even if admitted, risks hindering the successful prosecution of a sexual assault case. *See* Tr. 176:12–21, 177:11–178:2, 178:13–179:7, 183:13–184:19, 187:12–25.

63.    In criminal cases in which a SAFE is conducted, the SANE who conducted the SAFE is routinely called as a witness at trial to testify to the collection procedure and results of the exam. *See* Tr. 172:7–173:5. It is also common for defense attorneys to stipulate to the admissibility and credibility of evidence collected through a SAFE. *See* Tr. 176:12–21.

64.    If Plaintiffs' Kits were to be used instead, it would be extremely unlikely that a defense attorney would stipulate to the Kit's admissibility or credibility, and the survivor would likely have to testify at length regarding their own evidence collection process. *See* Tr. 176:12–21, 186:9–187:4.

65.    In addition to the amplified re-traumatizing effect it would have on the survivor, *see* Tr. 186:25–187:4, this required testimony would also present ample ways for a criminal defendant to attack the reliability of the evidence, including the unavoidable bias of the testifying survivor who collected the evidence, *see* Tr. 186:17–24, the potential fact that the survivor may have been intoxicated and/or under significant stress at the time of collection, *see* Tr. 176:1–11, and the lack of comprehensiveness and scientific credibility of the self-collection process, *see* Tr. 187:20–25, to name a few.

b.  *Plaintiffs misleadingly state that Leda Health's services meet survivors' medical and mental health needs*

66.    Plaintiffs represent in marketing the Kits that they "extend options to folks including those who are unable or unwilling to utilize more traditional hospital and mental health services with a *holistic* suite of services *designed to meet the needs of survivors.*" PL-6 at 4, 11 (emphasis added).

67.     However, a survivor utilizing a Leda Kit at home does not receive medical treatment. According to Plaintiffs' witnesses who testified at the Hearing, members of Leda Health's "Care Team" do not function as nurses when they assist survivors in the collection of evidence using the Kits. *See* Tr. 109:19–110:3.

68.     In contrast, it is standard procedure for SANEs to provide necessary medical treatment to a survivor as part of the SAFE process, including sexually transmitted infection testing, emergency contraception, evaluation and treatment of physical injuries, and referrals to further medical care and mental health resources. *See* Tr. 128:12–129:4, 134:15–135:11, 136:12–138:4, 140:18–141:3.

69.     Plaintiffs' expert witness testified that SANEs, in collecting evidence as part of a SAFE exam, adhere to "local protocol." Tr. 106:15–24. Training of the Leda Health's Care Team members does not include learning the applicable state regulations, laws, protocols, or practices of sexual assault evidence collection. *See* Tr. 122:3–9.

        c.   *Plaintiffs misleadingly imply that possession of the Kits will deter sexual assault*

70.     Leda Health's marketing and social media posts repeatedly imply that its Kit can be a deterrent for sexual assault and that survivors are somehow safer if they possess a Kit. *See* DNY-26 ¶¶ 41–47. Plaintiffs offered no evidence to contradict the NYAG's preliminary findings.

**D.   The Parties' Interactions Following the Draft AOD**

71.     Prior to sending the Draft AOD, the NYAG had previewed its contents with Leda Health's counsel, and advised Leda Health's counsel that the NYAG would consider comments from Leda Health on the Draft AOD's terms. *See* DNY-1 ¶ 23.

72.     The NYAG has not communicated to Plaintiffs that the NYAG intends to take enforcement action against them, including in the event that Leda Health did not agree or respond to any of the Draft AOD's terms. *See* DNY-1 ¶¶ 7, 9–10, 17, 23.

73.     The NYAG anticipated and welcomed comments from Leda Health's counsel, including a markup of the Draft AOD. *See* DNY-1 ¶ 23.

74.     Leda Health's counsel confirmed that Leda Health shared that understanding by representing—after this action was filed but before the NYAG was served—that Leda Health was "still working on a redline of the Draft AOD" and expected to get the NYAG a "revised draft for discussion by Friday, July 5." DNY-1 ¶ 26; DNY-25 at 1.

75.     To date, the NYAG has not initiated an enforcement action against Leda Health or Ms. Campbell. *See* DNY-1 ¶ 25. To date, no five-day written notice has been issued to Plaintiffs, which is ordinarily a prerequisite to commencement of the NYAG's enforcement actions. *See id.* ¶¶ 24–25.

76.     By their express terms, the Letter, investigative Subpoena, and Draft AOD are not self-executing documents. *See id.* ¶¶ 7, 9–10, 17, 23; DNY-3; DNY-7; DNY-26; NYAG PI Opp'n at 3–5.

77.     Plaintiffs did not take down or modify the Leda Health website in any way in response to the Draft AOD issued by the NYAG, and currently continue to market the Kits in New York and elsewhere. *See* Tr. 87:25–88:11.

78.     Leda Health continues to advertise and market its Kits on its website. *See* PL-6 at 2–3, 8, 11.

## PROPOSED CONCLUSIONS OF LAW

1.     This Court must consider the NYAG's jurisdictional and venue arguments before turning to the merits of Plaintiffs' PI Motion. *See Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)."); *Reading Health Sys. v. Bear Stearns & Co.*, 900 F.3d 87, 95 (3d Cir. 2018) ("We agree that threshold disputes over venue and jurisdiction should be resolved before

merits disputes."); *In re Diet Drugs*, 282 F.3d 220, 229 (3d Cir. 2002); *see also Trs. of Gen. Assembly of Lord Jesus Christ of Apostolic Faith, Inc. v. Patterson*, 527 F. Supp. 3d 722, 748 (E.D. Pa. 2021).

2.      This case is dismissed as against the NYAG, and Plaintiffs' PI motion is denied as moot as to the NYAG, because the Court lacks personal and subject matter jurisdiction over the NYAG, and because this District is an improper venue for Plaintiffs' claims as against the NYAG.

**I.      This Court Lacks Personal Jurisdiction Over the NYAG**

3.      As this Court ruled by Order dated August 6, 2024 (ECF 43), the NYAG raised, and at all relevant times preserved, its defense of lack of personal jurisdiction, and has not waived such defense.[5]

4.      Plaintiffs bear the burden of establishing personal jurisdiction. *See D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft* Ltd*., 566 F.3d 94, 102 (3d Cir. 2009) (citing *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001)); *see also O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 316 (3d Cir. 2007); *D.J. v. Univ. of Iowa Hosps. & Clinics*, No. 22-CV-752, 2024 WL 3254253, at *2 (W.D. Pa. June 30, 2024) (Bissoon, J.).

5.      Where, as here, the Court has conducted an evidentiary hearing, "the plaintiff has the more substantial burden of proving that personal jurisdiction is proper by a preponderance of the

---

[5] In a footnote of their Opposition to the NYAG's Motion to Dismiss, filed after this Court's ruling, Plaintiffs repeat their assertion that the NYAG waived its personal jurisdiction defense. *See* Pls.' Opp'n (ECF 46) at 11 n.5. There is no basis for Plaintiffs' argument and this Court rejects it. The NYAG consistently asserted lack of personal jurisdiction as its primary defense—first at the status conference a week after being served, then in its motion to dismiss and in its opposition to Plaintiffs' PI motion, and again at the August 26, 2024 Hearing itself. *See, e.g.*, Tr. 20:18–21:10, 88:25–89:3, 216:8–11. This posture bears no resemblance to the two Third Circuit cases Plaintiffs relied upon in their Opposition to the NYAG's Motion to Modify the Court's July 2, 2024 Scheduling Order (ECF 40). *See Wyrough & Loser, Inc. v. Pelmor Labs, Inc.*, 376 F.2d 543, 547 (3d Cir. 1967) (defendant participated in multi-day preliminary injunction hearing before first raising personal jurisdiction defense); *see also In re Texas E. Transmission Corp. PCB Contamination Ins. Coverage*, 15 F.3d 1230, 1236 (3d Cir. 1994) (defendant failed to move for dismissal of counterclaim for lack of service and affirmatively moved for summary judgment on other grounds before raising personal jurisdiction defense).

evidence." *Hufnagel v. Ciamacco*, 281 F.R.D. 238, 244 (W.D. Pa. 2012) (quoting *Leone v. Cataldo*, 574 F. Supp. 2d 471, 477 (E.D. Pa. 2008)).

6.      A court may exercise personal jurisdiction over a defendant only if it is permissible under the state's long-arm statute and the Due Process Clause of the Fourteenth Amendment. *See* Fed. R. Civ. P. 4(j)(2)(B); *Eurofins Pharma U.S. Holdings v. BioAlliance Pharma S.A.,* 623 F.3d 147, 155 (3d Cir. 2010); 42 Pa. Con. Stat. § 5322(b); *Time Share Vacation Club v. Atlantic Resorts, Ltd.,* 735 F.2d 61, 63 (3d Cir. 1984). The Pennsylvania long-arm statute extends to the limits of the Due Process Clause, which requires that sufficient minimum contacts exist between the nonresident defendant and the plaintiff's chosen forum for personal jurisdiction to be proper. *See Time Share,* 735 F.2d at 63; *Eurofins Pharma.,* 623 F.3d at 155; *Kehm Oil Co. v. Texaco, Inc.*, 537 F.3d 290, 299 (3d Cir. 2008).

7.      Though personal jurisdiction can be general or specific, this case implicates only the latter because Plaintiffs do not allege that the NYAG has affiliations with Pennsylvania that are so continuous and systematic as to render it "essentially at home in the forum state." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

8.      Determining whether specific jurisdiction exists is a three-part inquiry. First, a plaintiff must show that the defendant purposefully directed certain of its activities toward the forum state such that it "invok[es] the benefits and protections of its laws." *Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co.*, 75 F.3d 147, 150 (3d Cir. 1996). Second, the cause of action must arise out of those same activities. *O'Conner,* 496 F.3d at 317; *Centimark Corp. v. Lavine*, No. 11-CV-0757, 2011 WL 2941214, at *5 (W.D. Pa. June 20, 2011). Third, the district court must consider whether the exercise of specific jurisdiction comports with notions of fair play and substantial justice. *O'Conner,* 496 F.3d at 317; *Centimark Corp.,* 2011 WL 2941214, at *5; *cf. Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476, 484 (5th Cir. 2008) (quoting *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)).

9.      Plaintiffs have failed to establish any of these requirements. To the contrary, as detailed above, the record establishes that:

- the NYAG has been conducting an entirely New York-based investigation of a company doing business in New York for violations of New York law;

- the NYAG's investigation was conducted by staff located in its New York City office who never traveled to Pennsylvania;

- the NYAG attorneys involved in the investigation into Plaintiffs' conduct never travelled to Pennsylvania, retained, or contracted with any person or entity in Pennsylvania, communicated with consumers in Pennsylvania, or sought information by letter or formal process from a person or entity located in Pennsylvania;

- all documents prepared as part of the investigation, including the Letter, the Subpoena, the Draft AOD, and e-mail correspondence with Leda Health's counsel were drafted in and issued from New York;

- the NYAG sent the Letter to Plaintiffs' Brooklyn Location;

- the NYAG attempted to serve the Subpoena at Plaintiffs' Brooklyn location and when Plaintiffs' counsel accepted service of the Subpoena Plaintiffs' sole office was at the Brooklyn Location;

- as to the Subpoena and Draft AOD, the NYAG never communicated with Plaintiffs directly, but directed all communications to Plaintiffs' outside counsel;

- for almost the entirety of the NYAG investigation, Leda Health's sole office was located in New York;

- the NYAG only became aware in October 2023 from press reports that Leda

19

Health planned to open a second office in Pittsburgh, and it has never directly contacted Campbell or Leda Health at that office;[6]

- throughout the duration of the NYAG's investigation Plaintiffs represented to the NYAG, the public, and testified under oath that they operated out of an office in Brooklyn, New York. *See, e.g.*, DNY-1 ¶¶ 5, 7, 11–14, 19. Leda Health continues to conduct business in New York, where its Chief of Staff is located;

- the focus of the NYAG investigation is on Plaintiffs' marketing of the Kits in New York and potential violations of New York law; and

- the Draft AOD reflects the NYAG's understanding that Plaintiffs do business in New York, proposed injunctive relief limited to New York, and would be governed by New York law.

10.    In sum, contrary to Plaintiffs' assertion, the NYAG has done nothing to "purposely avail[] [it]self of the benefits of Pennsylvania Law." Compl. ¶ 17. Consequently, Plaintiffs failed to establish that the NYAG's investigatory activities were purposefully directed at Pennsylvania and are sufficient to confer personal jurisdiction over the NYAG.

11.    Plaintiffs principally rely on *Defense Distributed v. Grewal*, 971 F.3d 485 (5th Cir. 2020), and *Media Matters for Am. v. Paxton*, No. 24-CV-147, 2024 WL 1773197 (D.D.C. Apr. 12, 2024), to claim personal jurisdiction exists (ECF 46), but both cases are inapposite, as they involved attempts

---

[6] Plaintiffs' reliance upon a letter sent by the ESD to Leda Health on November 20, 2023 is misplaced. *See* Pls.' Resp., Glover Decl. (ECF 46-1) at 2–4. As set forth in the NYAG's Reply Memorandum (ECF 50), communications between Plaintiffs and ESD—an organization that is entirely separate from the NYAG—are irrelevant to this case. Even if they were relevant, the letter indicates that Plaintiffs were based in New York for almost the entirety of the NYAG's investigation, and that Leda Health executed an agreement with ESD to "maintain its principal place of business within the state of New York until February 2025[,]" *id.* at 2–3—points that strengthen the NYAG's argument that it did not purposefully avail itself of Pennsylvania law.

by attorneys general to regulate activity in the forum state that had no apparent connection to their home states.

12.    In *Grewal*, the New Jersey Attorney General sent a cease-and-desist letter to a Texas-based company and "d[id] not cabin his request by commanding plaintiffs to stop publishing materials to New Jersey residents[,]" but instead "demanded that the plaintiffs cease publication of their materials generally[,]" and effectively "requested that [the plaintiff] 'halt publication of [its materials]'" outside of New Jersey. 971 F.3d at 492. Similarly, in *Media Matters*, the court found it crucial that the Texas Attorney General had "promised to 'vigorously enforce'" Texas state law against the District of Columbia-based nonprofit "Media Matters for 'fraudulent acts' with no apparent connection to Texas." 2024 WL 1773197, at *11. In that case the Texas Attorney General also hired a process server in the forum state which "create[d] an agency relationship." *Id.* at *10.

13.    In contrast here it is undisputed that the Letter was sent to Plaintiffs' office in New York, which at that time was the sole office from which Plaintiffs operated. It is likewise undisputed when the NYAG's Draft AOD was sent, (i) Plaintiffs continued to conduct business in New York (through their Chief of Staff) and represent on their website that they retained a New York office location; (ii) the proposed relief in the Draft AOD explicitly applied solely to business activities within New York state; and (iii) the oversight provision in the Draft AOD was limited to reporting compliance with the New-York specific injunctive relief. Moreover, unlike in *Media Matters*, it is undisputed that the NYAG never hired a process server in Pennsylvania or, for that matter, retained or contracted with any person in the State.

14.    In fact, courts have found no personal jurisdiction even where—unlike here—government investigators actually contact individuals under investigation in the forum state. *See, e.g.*, *Gary v. F.T.C.*, 526 F. App'x 146, 150 (3d Cir. 2013) (communications between an investigator affiliated with defendant New Jersey Department of Consumer Affairs and the Pennsylvania plaintiff were not

sufficient to establish minimum contacts where the communications were sparse, over phone and by mail, and the investigator remained in New Jersey during the time he communicated with plaintiff); *see also Wercinski*, 513 F.3d at 484 (Arizona Department of Real Estate did not direct its activities into Texas merely because it sent two cease-and-desist orders to a Texas-based business which sold timeshares to Arizona consumers; defendant's intent was merely to uphold and enforce the laws of Arizona); *Shotton v. Pitkin*, No. 15-CV-241, 2015 WL 5091984, at *3 (W.D. Okla. Aug. 28, 2015) (in holding that the court lacked personal jurisdiction over out-of-state official, observing that it "appears a majority of courts have reached substantially the same conclusion for circumstances where, as here, the contacts urged as the sole basis for jurisdiction were 'cease-and-desist' letters or notices issued by regulators or others").

15.    Moreover, considerations of federalism and state sovereignty provide further grounds to find that haling the NYAG into a federal court in Pennsylvania would run afoul of the Due Process Clause. "Federalism and state sovereignty are an essential part of the constraints that due process imposes upon personal jurisdiction," and they prevent a federal district court from exercising personal jurisdiction "over a nonresident state official." *Wercinski*, 513 F.3d at 488. "The sovereignty of each State . . . implie[s] a limitation on the sovereignty of all of its sister States—a limitation express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment." *World-Wide Volkswagon Corp. v. Woodson,* 444 U.S. 286, 293 (1980). "The effect of holding that a federal district court in . . . ha[s] personal jurisdiction over a nonresident state official would create an avenue for challenging the validity of one state's laws in courts located in another state." *Wercinski*, 513 F.3d at 488. Such a practice—which is precisely what Plaintiffs seek to do here— "would greatly diminish the independence of the states." *Id.* State officials should not "have to defend [their] attempt to enforce [state] laws in courts throughout the nation." *Id.* at 487.

16.    Numerous federal courts have applied this reasoning to find that they lacked personal jurisdiction over out-of-state regulatory officials where, as here, such officials propose to enforce their own laws based on the activities of businesses or individuals within their states. *See, e.g., WinRed, Inc v. Ellison*, 581 F. Supp. 3d 1152, 1160–61 (D. Minn. 2022), *aff'd sub nom. WinRed, Inc. v. Ellison*, 59 F.4th 934 (8th Cir. 2023) (finding no personal jurisdiction over out-of-state attorneys general based on investigation of foreign defendant); *Wercinski*, 513 F.3d at 486 (declining to exercise personal jurisdiction over Arizona regulator investigating Texas citizen, because to hold otherwise would mean that "any state official seeking to enforce her state's laws[ ]could potentially be subjected to suit in any state where the validity of her state's laws were in question"); *B & G Prods. Co. v. Vacco*, No. 98-CV-2436, 1999 WL 33592887, at *4 (D. Minn. Feb. 19, 1999) ("By merely regulating a Minnesota-based company, New York has not subjected itself to a lawsuit in the home state of one of its many regulatory targets."); *Berry Coll., Inc. v. Rhoda*, No. 13-CV-115, 2013 WL 12109374, at *7 (N.D. Ga. June 12, 2013) ("Any § 1983 claim that [the Georgia] Plaintiff may assert arises from [the Tennessee Government] Defendants' regulation of Plaintiff's activity in Tennessee, not from Defendants' activity within Georgia.").

17.    For the foregoing reasons, the Court finds that Plaintiffs have not met their burden to show that the NYAG has purposefully availed itself of the laws of Pennsylvania "such that [it] should reasonably anticipate being haled into court" there. *World-Wide Volkswagen Corp.*, 444 U.S. at 297. Rather, the evidence shows that the NYAG has merely investigated violations of New York state law by a New York-based company. The NYAG's Motion to Dismiss on personal jurisdiction grounds is granted.

## II.    **This Court Lacks Subject Matter Jurisdiction Over the Claims Against the NYAG**

18.    "Plaintiffs bear the burden of establishing this Court's jurisdiction and, therefore, standing and ripeness." *Persico v. Sebelius*, 919 F. Supp. 2d 622, 625 (W.D. Pa. 2013). "The concepts of

standing and ripeness are related" in that "[e]ach is a component of the Constitution's limitation of the judicial power to real cases and controversies." *Presbytery of N.J. of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1462 (3d Cir. 1994).

19.    Although First Amendment claims are "subject to a relaxed ripeness standard[,]" *Peachlum v. City of York, Pa.*, 333 F.3d 429, 434 (3d Cir. 2003), even in that context, an action is not ripe for adjudication where plaintiffs fail to establish that they "face 'a real and immediate threat of enforcement[,]'" *Tait v. City of Philadelphia*, 639 F. Supp. 2d 582, 596 (E.D. Pa. 2009) (quoting *Salvation Army v. Dep't of Cmty. Affs. of State of N.J.*, 919 F.2d 183, 192 (3d Cir. 1990)). *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.").

20.    Plaintiffs failed to demonstrate that the NYAG's investigation and related settlement proposal—in the absence of any actual or threatened court enforcement proceedings—has sufficiently "chilled" their speech to plead any cognizable injury. *See, e.g.*, *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 647 (3d Cir. 1990); *Tait*, 639 F. Supp. 2d at 596 (quoting *Salvation Army*, 919 F.2d at 192); *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1176 (9th Cir. 2022); *see also* NYAG MTD Brief at 9–17.

21.    Plaintiffs claim that the NYAG has "deliberately targeted Leda Health and Ms. Campbell by threatening legal action[,]" Compl. ¶ 7, via issuance of the Letter, the Subpoena, and the Draft AOD. *See id.* ¶¶ 43–52.

22.    As a threshold matter, the 2019 Letter is irrelevant because any claim based on it is time-barred. Section 1983 claims are governed by the relevant state's statute of limitations for personal injury actions. *Wilson v. Garcia*, 471 U.S. 261, 276 (1985). In Pennsylvania, the limitations period for personal injury actions is two years and begins running when the cause of action accrues. 42 Pa. Cons. Stat. Ann. § 5524(2); *Elliott Reihner Siedzikowski & Egan, P.C. v. Pa. Emps. Benefit Trust Fund*, 29 F. App'x 838, 840 (3d Cir. 2002). A "§ 1983 claim accrues, and the statute of limitations begins to run, 'when

the plaintiff knew or should have known of the injury upon which its action is based.'" *Arneault v. O'Toole*, 864 F. Supp. 2d 361, 390 (W.D. Pa. 2012), *aff'd on other grounds*, 513 F. App'x 195 (3d Cir. 2013). Here, Plaintiffs knew or should have known of any alleged injury from the Letter when they received it in September 2019, yet they failed to file suit until June 2024, by which point any claims based on the Letter were untimely.

23.     Even setting aside that any claims based on the Letter are time-barred, it is undisputed that the Letter was sent nearly five years ago, and that the NYAG has since taken no steps to enforce the Letter. Under such circumstances Plaintiffs have not carried their burden of establishing that their speech is currently chilled by the Letter.

24.     Plaintiffs likewise have failed to establish their speech has been chilled by the Subpoena and Draft AOD.

25.     The Subpoena contains no specific threat of enforcement against Plaintiffs, *see Presbytery*, 40 F.3d at 1463, nor is it self-executing in any way. The NYAG would have to bring a court proceeding to enforce the Subpoena against Plaintiffs. *See* N.Y. Exec. Law § 63(12); N.Y. C.P.L.R. § 2308(b); *see, e.g., Twitter, Inc.*, 56 F.4th at 1176 (opining that the plaintiff "has not suffered an Article III injury because the [civil investigatory demand at issue] is not self-enforcing"). Indeed, in one case, where the Mississippi Attorney General issued an administrative subpoena to Google and Google then sued the Mississippi Attorney General on grounds including violation of the First Amendment, the Circuit Court reversed the district court's grant of injunctive relief to Google because "neither the issuance of the non-self-executing subpoena nor the possibility of some future enforcement action created an imminent threat of irreparable injury ripe for adjudication." *Google, Inc. v Hood*, 822 F.3d 212, 228 (5th Cir. 2016). Here, as in *Google*, the Subpoena is not self-executing and cannot form the basis of a claim for injunctive relief. *See Wearly v. Fed. Trade Comm'n*, 616 F.2d 662, 665 (3d Cir. 1980)

(noting that there is generally no adequate remedy at law for a pre-enforcement challenge to a non-self-executing investigative subpoena).

26.     The Draft AOD likewise contains no specific threat of enforcement and is not self-executing. Rather, the Draft AOD reflects a proposed voluntary stipulation of settlement that was never executed by the parties. Plaintiffs have not established that the NYAG has communicated any threat of enforcement if Plaintiffs refused to agree to the Draft AOD. To date, no enforcement action has been filed by the NYAG against Plaintiffs. Indeed, the NYAG has not served the statutory notice that is a prerequisite to bringing an enforcement action to enjoin Plaintiffs' conduct under New York's deceptive practices act. DNY-1 ¶ 25; *see* N.Y. GBL § 349(c). Plaintiffs offer no authority for the proposition that the mere conveyance of a voluntary settlement proposal, with no accompanying threat of enforcement, can reasonably chill protected speech. *See Williams v. Pa. Dep't of Corrs.*, No. 18-CV-170, 2020 WL 5237606, at *17 (W.D. Pa. Aug. 14, 2020) (noting that, even where the settlement offeror is a government entity, "an unsatisfactory settlement agreement" would not reasonably chill the offeree's protected speech).

27.     Thus, Plaintiffs have failed to establish that they currently face an "immediate" and "substantial threat of real harm" arising from the issuance of these documents such that the parties' interests are sufficiently adverse. *Presbytery*, 40 F.3d at 1463.

28.     That conclusion is confirmed by Plaintiffs' failure to offer any non-speculative, concrete evidence that the Letter, Subpoena, or Draft AOD are presently having any effect on Leda's speech.

29.     The Complaint makes the conclusory allegation that Leda "has refrained from pursing [sic] business operations in New York," but provides no further detail. Compl. ¶ 59. In her Declaration, Madison Campbell asserts that Leda Health sells its Kits to partner companies or entities, Campbell Decl. ¶ 13, but the only specific actual or potential partner entity mentioned in the

Declaration is located out-of-state in Washington, and Plaintiffs offered no evidence to establish that Leda Health's communications with that entity have been chilled by the NYAG's investigation. *Id.* ¶ 14.[7]

30.     Similarly, in her Declaration, Ms. Campbell asserts, in purely conclusory terms, that Leda Health "would like to" contact New York companies to engage in marketing activities and is "afraid to do so," but does not identify any such New York companies, describe any actual or prospective relationship with any New York company, or explain how any such relationship has been chilled, or even affected, by the NYAG's investigation.

31.     At the Hearing, Plaintiffs likewise offered no concrete evidence that their speech has been chilled as a result of the NYAG's actions. Indeed, as detailed above, Ms. Campbell confirmed that the Leda Health website is still live in New York, that Plaintiffs made no modification of the website after receipt of the Draft AOD, and that Leda continues to conduct business from New York.

32.     The Court finds that Plaintiffs' vague, conclusory assertions of harm set forth in their motion papers and repeated by Ms. Campbell at the Hearing fall far short of satisfying their burden to establish a justiciable dispute. *See Twitter*, 56 F.4th at 1175 (finding "vague" claims and "naked assertion[s]" insufficient to demonstrate "the chilling effect" of an investigation). The NYAG's Motion to Dismiss on subject matter jurisdiction grounds is granted.

---

[7] Indeed, Washington State passed legislation that restricts Leda Health's marketing of its Kits in that State. Revised Code of Washington § 5.70.070.  In Plaintiffs' Complaint filed on June 19, 2024 in the Western District of Washington naming the Governor and Attorney General of Washington as defendants, Plaintiffs assert that Washington's legislative and regulatory conduct violated their First Amendment rights and impacted Plaintiffs' business. *See Leda Health Corporation v. Inslee*, 24-CV-871 (W.D. Wa.) (ECF 1). Notably, Plaintiffs make no allegation in the *Inslee* complaint that the NYAG's activities contributed to their purported inability to do business with the referenced sorority. *See id.*; Campbell Decl. filed in *Inslee* (ECF 11) ¶¶ 13, 16, 22.

**III.**    **The Western District of Pennsylvania is an Improper Venue as to the NYAG**

33.    Plaintiffs claim that venue in this District is proper under 28 U.S.C. § 1391(b)(2), which states that "a civil action may be brought in . . . a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." Plaintiffs further assert that Defendants "have threatened Plaintiffs with conduct through actions directed at Plaintiffs' business activities, a substantial portion of which occur in the Western District of Pennsylvania." Compl. ¶ 18.

34.    Here, the "event[] . . . giving rise to the claim[,]" § 1391(b)(2), is the NYAG's investigation which, as described above, occurred entirely within New York. While Plaintiffs assert that their alleged harm would purportedly be felt in Pennsylvania, that does not satisfy the "transactional venue" standard they invoke. *Stanton-Negley Drug Co. v. Pa. Dep't of Pub. Welfare*, 07-CV-1309, 2008 WL 1881894, at *5 (W.D. Pa. Apr. 24, 2008) (finding venue improper in the Western District of Pennsylvania even though "Plaintiffs may feel the impact of [the challenged] policies" there, because plaintiffs' claims were "directed at the policies and policymakers" located in a different district); *see Leroy v. Great W. United Corp.,* 443 U.S. 173, 183 (1979); Wright & Miller, *Fed. Prac. & Proc.* § 3806 ("[S]uffering economic harm within a district is not by itself sufficient to warrant transactional venue there.").

35.    The Supreme Court's decision in *Leroy* is instructive. In that case, a Texas company sued Idaho officials in Texas to enjoin them from enforcing an Idaho law that imposed restrictions on the company's planned stock purchase. 443 U.S. at 175–76. The Fifth Circuit held that venue was proper in Texas because "that is the place where the Idaho officials" prevented plaintiff from initiating its stock purchase. *Id.* at 183. However, the Supreme Court reversed, holding that the claim "has only one obvious locus—the District of Idaho"—because "the enactment of the statute by the legislature," the review of plaintiff's conduct, the regulatory action by the Idaho officials to restrain plaintiff's stock purchase, "as well as the future action that may be taken" by the Idaho officials "to punish or to

28

remedy any violation of its law" all had occurred or would occur in Idaho and are the events that provide the basis for plaintiff's claim. *Id.* at 185–86.

36.    The same is true here. The "obvious locus" of Plaintiffs' claims is not in this District, but in the courts of New York, given that: the NYAG's authority to conduct civil investigations is derived from New York law; the Letter, Subpoena, and Draft AOD were all issued from New York; and any enforcement action that the NYAG might bring would be venued in New York State court and would seek to enforce New York's consumer protection laws. *See* DNY-1 ¶¶ 4, 6, 15, 22.

37.    For the foregoing reasons, the Court holds that venue in the Western District of Pennsylvania is improper.

## IV.    Plaintiffs Are Not Entitled to Preliminary Injunctive Relief

38.    A preliminary injunction is an "extraordinary" equitable remedy that is "never awarded as of right." *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)); *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017) (citing *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014)).

39.    A party may be granted a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 24.

40.    Plaintiffs bear the burden of establishing (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20. The final two factors—the balance of the equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

41.    Plaintiffs fail to establish (i) that they are likely to succeed on the merits of their claims; (ii) that they have been irreparable harmed; or (iii) that the requested injunction is in the public interest. The PI Motion is denied as against the NYAG for these additional reasons.

### A.     Plaintiffs Are Not Likely to Succeed on the Merits

42.     As set forth in greater detail above this Court finds that it lacks personal jurisdiction over the NYAG, lacks subject matter jurisdiction over the claims against the NYAG, and that venue is improper as to the NYAG. The NYAG is dismissed from this case on those bases. Even if the Court were to reach the merits of Plaintiffs' claims as against the NYAG, however, the Court would find that Plaintiffs are unlikely to succeed on those claims—and that they should be dismissed— because Plaintiffs fail to adequately plead or prove that the NYAG's investigation into their misleading advertisements violated the First Amendment.

43.     In assessing whether a moving party is likely to succeed for purposes of a preliminary injunction motion, "the trial court should analyze the elements of the movant's claims to determine whether the movant can likely meet each element." *Fres-co Sys. USA, Inc. v. Hawkins*, 690 F. App'x 72, 77 (3d Cir. 2017).

44.     Plaintiffs claim that the NYAG's actions constitute First Amendment (1) retaliation and (2) coercion. *See* Compl. ¶¶ 78–97. Plaintiffs are not likely to succeed on the merits of any element of either of these claims.

### a.     First Amendment Retaliation

45.     "To plead retaliation for the exercise of First Amendment rights, a plaintiff must allege (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Mirabella v. Villard*, 853 F.3d 641, 649 (3d Cir. 2017) (internal quotation marks omitted); *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006). Plaintiffs have failed to plausibly allege or sufficiently prove any of these three prongs.

i.    *Plaintiffs have not engaged in constitutionally protected conduct*

46.    Plaintiffs' marketing messages at issue in this case are not "constitutionally protected" because they constitute misleading commercial speech, which enjoys no such protection and may be prohibited. *Thomas,* 463 F.3d at 296.

47.    Plaintiffs contended in their PI Motion that Defendants violated their "core political speech," Pls.' PI Mot. (ECF 2) at 18, but they did not develop that point in their briefing or argue it at the Hearing. In any case, the Court finds that the speech here is commercial.

48.    "The Supreme Court has cited three factors to consider in deciding whether speech is commercial: (1) is [the] speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech." *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 933 (3d Cir. 1990) (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983)). Although "[a]n affirmative answer to all three questions provides strong support for the conclusion that the speech is commercial[,]" *id.* (internal quotation marks omitted), "all three characteristics need not be present for a given expression to qualify as commercial speech[,]" *Greater Phila. Chamber of Com. v. City of Philadelphia*, 949 F.3d 116, 137 (3d Cir. 2020). Commercial speech remains commercial in nature even if it "contain[s] discussions of important public issues." *Bolger*, 463 U.S. at 67–68 (contraceptive advertisements were commercial speech, even though they discussed public-health issues). And for commercial speech to come within the protection of the First Amendment, "it at least must concern lawful activity and not be misleading." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980).

49.    Here, there is no dispute that the Letter, Subpoena, and Draft AOD concern only Plaintiffs' messaging surrounding the marketing and sales practices concerning Plaintiffs' at-home sexual assault testing Kits. In other words, to the extent that Plaintiffs claim they are engaged in "core political speech[,]" Pls.' PI Mot. (ECF 2) at 19, it is undisputed that the NYAG does not seek and has

31

not sought to curtail those activities. Rather, the NYAG has raised concerns with the deceptive and misleading messages Plaintiffs use in marketing and selling a particular product—at-home sexual assault testing Kits. It follows that the speech employed in the marketing and sales of the Kits (1) is "an advertisement" for the Kits, (2) "refers to a specific product[,]" *i.e.*, the Kits, and (3) is driven by an "economic motivation[,]" *i.e.*, selling the Kits. *U.S. Healthcare, Inc.*, 898 F.3d at 933. This is an inherently commercial transaction from which Plaintiffs hope to profit, as Ms. Campbell has made clear to potential investors. *See* DNY-23 at 2. Therefore, the speech at issue is commercial speech.

50.    Plaintiffs' commercial speech is misleading, and therefore not protected by the First Amendment. "[F]alse, deceptive, or misleading commercial speech may be banned." *Ibanez v. Fla. Dep't of Bus. & Pro. Regul., Bd. of Acct.*, 512 U.S. 136, 142 (1994). "A statement is materially misleading if it is likely to mislead a reasonable consumer acting reasonably under the circumstances." *Plavin v. Grp. Health Inc.*, 857 F. App'x 83, 85 (3d Cir. 2021); *see also* Black's Law Dictionary (12th ed. 2024) (defining "misleading" as "delusive; calculated to be misunderstood").

51.    Leda Health calls the Kits "Early Evidence Kits," creating the impression that its kits would be admissible as evidence, even though Leda Health concedes that the Kits have never been admitted as evidence in a civil or criminal case. Moreover, the Draft AOD —which Plaintiffs attached to the Complaint and which forms the basis of their claims—details the NYAG's views as to how Plaintiffs have propagated numerous misleading statements, including those concerning the Kits' admissibility and the idea that the Kits comprehensively meet survivors' health and safety needs following an assault. *See* DNY-26 ¶¶ 28–47. Thus, Plaintiffs' marketing representations are "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Plavin*, 857 F. App'x at 85. These statements constitute inherently misleading commercial speech, are not protected, and Plaintiffs therefore fail to establish a First Amendment retaliation claim.

52.    Notably, Ms. Campbell's intentions in marketing and offering to sell the Kits are not relevant to the question of whether the marketing and advertisements are misleading under applicable New York law. The elements of common law fraud such as intent and reliance need not be established to demonstrate a violation of New York Executive Law 63(12) and GBL §§ 349 and 350. *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940 (2012); *Oswego Laborers Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 26 (1995); *Matter of People v. Applied Credit Card Sys. Inc.,* 27 A.D.3d 104, 805 N.Y.S.2d 175 (3d Dep't 2005); *see also* NYAG PI Opp'n (ECF 34) at 3–5.

53.    Plaintiffs have argued that their speech is constitutionally protected if it is "literally true." Tr. 6. That argument cannot be squared with Supreme Court precedent, which makes clear that commercial speech is unprotected by the First Amendment if it is false *or misleading. See Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 566 ("For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading.").

54.    Plaintiffs have also argued that the states are required to remedy misleading speech through lesser means such as a disclaimer, rather than an outright prohibition. Tr. 6–7. That argument is contrary to longstanding Supreme Court precedent holding that "when the particular content or method of the advertising suggests that it is inherently misleading[,]" it "may be prohibited entirely," without resort to disclaimers. *In re R.M.J.*, 455 U.S. 191, 203 (1982) (emphasis added); *see also Dwyer v. Cappell*, 762 F.3d 275, 280 (3d Cir. 2014) (same).

55.    Such is the case here. Plaintiffs seek to market "early evidence kits" to survivors of sexual assault, thereby implying that evidence from the Kits can be used in courts, even though the Kits have never been—and are unlikely to be—admitted as evidence in any civil or criminal proceeding. The misleading nature of the speech at issue is intrinsic and inherent to the product itself, as well as Plaintiffs' central messaging surrounding the marketing of the product, including the

product's name. Therefore, a disclaimer would not cure the inherently misleading nature of Plaintiffs' product and the expressed purpose behind the sale of that product.

        *ii.    The alleged retaliatory action is insufficient to deter Plaintiffs' exercise of a constitutional right*

56.    Plaintiffs' retaliation claim also fails because they do not allege or establish a "retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights[.]" *Thomas*, 463 F.3d at 296. "[I]t is the plaintiff who has the burden to show that a defendant's conduct meets this threshold." *Noonan v. Kane*, 504 F. Supp. 2d 387, 404 (E.D. Pa. 2020) (citing *Revell v. City of Jersey City*, 394 F. App'x 903, 906 (3d Cir. 2010)). Furthermore, "[w]hen a public official's allegedly retaliatory acts are in the form of speech, the official's own First Amendment speech rights are implicated[,]" *Zaloga v. Borough of Moosic*, 841 F.3d 170, 176 (3d Cir. 2016), and "there can be no liability . . . unless there was a 'threat, coercion, or intimidation, intimating that punishment, sanction, or adverse regulatory action will follow[,]'" *Noonan*, 504 F. Supp. 2d at 404 (quoting *Mirabella*, 853 F.3d at 651).

57.    Plaintiffs allege that the NYAG—by sending the Letter, the Subpoena, and a Draft AOD—has "threaten[ed], coerc[ed], and intimidat[ed] [p]laintiffs into abandoning business opportunities in . . . New York[.]" Compl. ¶ 81. However, given that this case involves government speech, Plaintiffs fall far short of establishing that any of these documents constitute retaliatory action in this context. *See Noonan*, 504 F. Supp. 2d at 404.

58.    First, as discussed above, any claim based on the Letter is time-barred. Moreover, because the Letter is not self-executing, it does not constitute a threat, coercion, or intimidation. Instead, it is essentially a "criticism[], admonishment[], . . . [or] reprimand[,]" which the Third Circuit has concluded "does not rise to the level of a campaign of retaliatory harassment" or an "adverse

action" for purposes of a First Amendment retaliation claim involving government speech.[8] *Revell*, 394 F. App'x at 906.

59.     Second, regarding the investigative Subpoena, the fact that a governmental entity has "instigated an investigation into [ ] [P]laintiff[s] that [ ] [has] resulted in no adverse action[,]" *Adams v. Ross Twp.*, No. 20-CV-355, 2021 WL 972520, at *10 (W.D. Pa. Mar. 16, 2021), is "precisely the type of *de minimis* allegation[] that the Third Circuit has found [is] insufficient to support a claim for First Amendment retaliation[,]" *Herman v. Hosterman*, No. 11-CV-898, 2011 WL 4974184, at *3 (M.D. Pa. Oct. 19, 2011) (citing *Revell*, 394 F. App'x at 906).

60.     Finally, regarding the Draft AOD, which amounts to a proposed voluntary stipulation of settlement which was never accepted or executed, this similarly does not rise to the level of a retaliatory action. There is no support "for the proposition that an unsatisfactory settlement offer would 'deter a person of ordinary firmness' from exercising his [or her] First Amendment rights." *Williams*, 2020 WL 5237606, at *17. To conclude otherwise would suggest that a draft settlement offer, *a document which has no power unless agreed-to by the offeree*, constitutes a form of threat, coercion, or intimidation sufficient to chill free speech—a suggestion which "would trivialize the First Amendment[.]"[9] *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000). Accordingly, the NYAG's actions are *de minimis* and do not amount to retaliation as a matter of law, because they do not rise to the level of threat, coercion, or intimidation. *Noonan*, 504 F. Supp. 2d at 404.

---

[8] Moreover, although Plaintiffs temporarily took down their website following receipt of the Letter, they later reinstated the website, as well as their sales and marketing in New York. Thus, ultimately the Letter did not even "achieve [the NYAG's] desired effect[,]" which according to the Third Circuit, cuts strongly against a finding of retaliatory action. *Zaloga*, 841 F.3d at 176.

[9] Plaintiffs clearly did not take the Draft AOD as a threat as they did not take down the Leda Health website after receiving it and continue to market the Kits in New York. Tr. 88:5–11; *see generally* Compl. ¶¶ 52–59.

*iii. There is no causal link between the alleged protected conduct and the alleged retaliatory action by the NYAG*

61. Plaintiffs also must allege "a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas*, 463 F.3d at 296. Here, because Plaintiffs fail to meet their burden to establish either protected speech or retaliatory action, the Court need not reach the causation prong of the First Amendment retaliation analysis. *See Zimmerlink v. Zapotsky*, 539 F. App'x 45, 50 n.5 (3d Cir. 2013) ("Because [defendants'] conduct was insufficient to deter a person of ordinary firmness from exercising her First Amendment rights, we do not address the causation element of the retaliation claim.").

62. Regardless, Plaintiffs have also failed to establish causation. The Third Circuit requires "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 266 (3d Cir. 2007). The Third Circuit has been clear that courts must be "diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate." *Id.*

63. Assuming *arguendo* that some portion of Plaintiffs' speech was protected, there are simply no allegations in the Complaint and no evidence presented to this Court plausibly supporting an inference that the Letter or the Draft AOD were in retaliation for such protected speech. It is undisputed that both those documents are explicitly directed at the misleading nature of Leda's marketing, not any protected speech. Leda Health claims nothing unusual about the timing of either document—the Letter was sent after news reports surfaced of misleading advertising and the Draft AOD was sent after Leda Health completed its production in response to the Subpoena. Plaintiffs have offered no evidence of a pattern of antagonism toward Leda Health separate and apart from the

NYAG's concerns about misleading speech. As a result, even assuming that Leda Health plausibly alleged that it has engaged in some protected speech, Plaintiffs have failed to allege or establish the requisite causal link between that speech and the allegedly retaliatory actions.

b.    First Amendment Coercion

64.    Plaintiffs also claim a First Amendment violation based upon alleged coercion. *See* Compl. ¶¶ 88–96. But the First Amendment coercion doctrine relied upon by Plaintiffs only applies in the context of government coercion of a third party. As made clear in the Supreme Court's holdings in *NRA* and *Bantam Books* on which Plaintiffs rely, a First Amendment coercion claim necessarily concerns "coerc[ion] [of] a *third party* to violate the First Amendment rights of another." *NRA v. Vullo*, 602 U.S. 175, 191 (2024) (emphasis added).[10] In other words, the government may not issue a "'threat of invoking legal sanctions and other means of coercion' against a third party 'to achieve the suppression of disfavored speech[.]'" *Id.* at 180 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 66, 67 (1963)). Here, Plaintiffs do not claim any coercion of third parties whatsoever; rather they merely challenge the NYAG's investigation of Plaintiffs' own activities for potential violations of state law. Plaintiffs have provided no authority recognizing (much less sustaining) a First Amendment coercion claim in the absence of coercive threats to a third party. The coercion doctrine thus does not apply.

65.    Even if the coercion doctrine could apply absent a third party, as explained above, the Draft AOD is not coercive. And, misleading commercial speech is not protected by the First Amendment. *See Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 563 ("The government may ban forms of

---

[10] The other coercion cases cited by Plaintiffs, *see* Pls.' PI Mot. (ECF 2) at 27, likewise involved alleged coercion of third parties to suppress others' speech. *See Kennedy v. Warren*, 66 F.4th 1199, 1207 (9th Cir. 2023) (alleged coercion of booksellers to suppress speech of authors); *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230–32 (7th Cir. 2015) (alleged coercion of credit card companies to suppress speech of advertising website); *Okwedy v. Molinari*, 333 F.3d 339, 342–43 (2d Cir. 2003) (alleged coercion of billboard company to suppress speech of religious organization); *R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85, 88 (3d Cir. 1984) (alleged coercion of bank to suppress speech of lessor of billboard space).

communication more likely to deceive the public than to inform it[.]"). Thus, if the speech at issue is

misleading commercial speech, the Court's analysis stops there. *See id.* at 564.

66.    For the foregoing reasons, this Court finds that Plaintiffs have not established that

they are likely to succeed on the merits of their First Amendment claims against the NYAG.

**B.    Plaintiffs Have Not Shown Irreparable Harm Absent a Preliminary Injunction**

67.    The Court also finds that Plaintiffs have failed to establish irreparable harm from the

NYAG's ongoing investigation sufficient to warrant preliminary injunctive relief.

68.    To obtain a preliminary injunction, Plaintiffs must show "that they are likely to

experience irreparable harm without [it.]" *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir.

2000). And to show irreparable harm, the plaintiff must prove that "conditions [are] generating a

presently existing actual threat[,]" *id.* at 487, and that the threat is "immediate[,]" *CT Install Am., LLC

v. Boryszewski*, No. 22-CV-4557, 2023 WL 3306537, at *2 (E.D. Pa. May 8, 2023) (quoting *Hohe v. Casey*,

868 F.2d 69, 72 (3d Cir. 1989) (opining in the context of a First Amendment claim)).

69.    Moreover, "the risk of irreparable harm must not be speculative[,]" *Adams*, 204 F.3d

at 488, and "[i]f the harm complained of is self-inflicted, it does not qualify as irreparable[,]" *Caplan v.

Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (1995). Lastly, because "preliminary injunctions

are generally granted under the theory that there is an urgent need for a speedy action to protect the

Plaintiffs' rights[,]" *Lanin v. Borough of Tenafly*, 515 F. App'x 114, 117–18 (3d Cir. 2013), "[d]elay in

seeking enforcement of those rights . . . tends to indicate at least a reduced need for drastic speedy

action[,]" *id.* at 118.[11]

---

[11] Plaintiffs cite only two cases to support their claim of irreparable harm, yet both of them merely
stand for the uncontroversial proposition that once irreparable injury is shown, the duration of that
injury can be minimal in First Amendment cases. Pls.' PI Mot. (ECF 2) at 37 (citing *Roman Catholic
Diocese v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))). The language
in *Elrod* "that 'the loss of First Amendment freedoms, for even minimal periods of time,
unquestionably constitutes irreparable injury' addresses the requisite *duration* of a deprivation of First

70.     A plaintiff claiming First Amendment violations must "show a 'real or immediate' danger to their rights 'in the near future.'" *Conchatta, Inc. v. Evanko*, 83 F. App'x 437, 442 (3d Cir. 2003) (opining in the context of a pre-enforcement First Amendment case) (quoting *Anderson v. Davila*, 125 F.3d 148, 164 (3d Cir. 1997)). Moreover, the Third Circuit has held in the context of a First Amendment case that there was no irreparable harm where "the only apparent effects [of a challenged governmental action were] self-imposed [by plaintiffs], . . . [and] the statute ha[d] not been enforced or threatened to be enforced against the plaintiffs[.]" *Id.* at 443.[12]

71.     As discussed above, Plaintiffs offered no evidentiary support for their claim that the NYAG's investigation has unconstitutionally chilled their speech. Rather, the record reflects that Plaintiffs have not missed business opportunities due to the NYAG's actions. But even if they had, such harm would be "self-inflicted[,]" which the Third Circuit has held "does not qualify as irreparable" harm. *Caplan*, 68 F.3d at 839; *see Conchatta, Inc.*, 83 F. App'x at 443 (concluding the same in a First Amendment case). *Cf. Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012) ("[P]laintiffs who decline the opportunity to avail themselves of a regulatory scheme to avoid the very harm for which they seek injunctive relief have been denied the [injunctive] relief[.]" (internal quotation marks omitted)).

---

Amendment rights, but does not suggest that a real or threatened deprivation need not occur." *Conchatta, Inc. v. Evanko*, 83 F. App'x 437, 442 n.3 (3d Cir. 2003) (quoting *Elrod*, 427 U.S. at 373).

[12] Plaintiffs' reliance on *National People's Action v. Wilamette*, 914 F.2d 1008, 1013 (7th Cir. 1990), for their contention that preliminary injunctions are particularly appropriate in First Amendment cases, is misplaced, given that Plaintiffs' misleading commercial speech is not protected by the First Amendment. Moreover, the Seventh Circuit applies a presumption of irreparable harm in First Amendment cases. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("The loss of First Amendment freedoms is presumed to constitute an irreparable injury[.]"). However, the Third Circuit does not apply such a presumption in pre-enforcement First Amendment challenges akin to this one. *Conchatta, Inc.*, 83 F. App'x at 442.

72. Nor have Plaintiffs shown they face an immediate "actually existing threat" because, as discussed above, the NYAG has taken no enforcement action against them and the steps that have been taken (*i.e.*, the Letter, the Subpoena, and the Draft AOD) are not self-executing and can only be enforced if the NYAG decides to bring a court proceeding. Thus, the harm Plaintiffs allege is not "immediate[,]" *Hohe*, 868 F.2d at 72 (emphasis omitted), and is wholly contingent on future events that may or may not occur.

73. Plaintiffs' years-long delay in seeking relief as to the NYAG's actions further underscores Plaintiffs' failure to show immediate and irreparable harm. *See Smart Commc'ns Holding, Inc. v. Global Tel-Link Corp.*, No. 21-CV-1708, 2022 WL 1049319, at *6 (M.D. Pa. Apr. 7, 2022) (noting Circuit cases that "have held that a lengthy, unexplained delay was a sufficient ground upon which to deny a request for preliminary injunction").

74. There is no dispute that Plaintiffs were aware of their potential claim as early as September 2019, when the NYAG issued the Letter which, along with the Subpoena and Draft AOD, form the basis of Plaintiffs' claims. *See* Compl. ¶¶ 43–49. It is therefore undisputed that Plaintiffs have waited almost five years since the issuance of the Letter to file their PI Motion. Plaintiffs offered no explanation for this delay in briefing or at the Hearing. "That is reason alone to deny the relief sought here." *Doe v. Banos*, 713 F. Supp. 2d 404, 415 n.15 (D.N.J. 2010) (noting that " lack of urgency as reflected in how this motion was brought before the Court undermines [plaintiff's] claim of immediate and irreparable harm to his First Amendment rights"); *see also CT Install Am., LLC*, 2023 WL 3306537, at *2–3 (finding that a delay of seventeen months between the underlying conduct and the filing of a motion for a preliminary injunction was too lengthy to establish irreparable harm); *Smart Commc'ns Holding, Inc.*, 2022 WL 1049319, at *7 (same, as to a thirteen-month delay); *see also New Dana Perfumes Corp. v. The Disney Store, Inc.*, 131 F. Supp. 2d 616, 630 (M.D. Pa. 2001) (finding that an unexplained

"delay, alone, preclude[d] a finding of irreparable harm, and therefore warrant[ed] denial of [a] preliminary injunction motion").

75.    Plaintiffs' choice to forgo any contemporaneous challenge to the NYAG's 2019 Letter and its 2023 Subpoena, despite being able to do so under New York's regulatory scheme, further undermines any assertion of irreparable harm. *See* CPLR §§ 2308(b)(1), 7803; NYAG PI Opp'n (ECF 34) at 9–10. Instead, Plaintiffs voluntarily produced documents to and negotiated with the NYAG's representatives.

76.    If the NYAG's investigatory actions were violative of Plaintiffs' constitutional rights, Plaintiffs could have availed themselves of New York state procedures that could have already provided Plaintiffs relief against the harm it now characterizes as "immediate" and "irreparable." Similarly, if the NYAG initiates an enforcement action against Plaintiffs in the future, including by providing the required five-day notice of such action, they will have a full and fair opportunity to raise any constitutional or other objections and defenses in state court. *See e.g.*, *Temple of the Lost Sheep Inc. v. Abrams*, 930 F.2d 178, 184 (2d Cir. 1991). Plaintiffs have failed to even address the remedies available to them under New York law.

77.    For the foregoing reasons, the Court concludes that Plaintiffs have failed to establish irreparable harm.

### C.    The Equities and Public Interest Weigh in the NYAG's Favor

78.    "[D]enial of injunctive relief may be appropriate when the balance of the harms and the public interest weigh against granting an injunction—even if the movant is both likely to succeed on the merits and likely to suffer irreparable harm." *Fres-co Sys. USA, Inc. v. Hawkins*, 690 F. App'x 72, 79 (3d Cir. 2017).

79.    Here, Plaintiffs' PI Motion is denied for the additional reason that they have failed to show an "injunction is in the public interest." *Winter*, 555 U.S. at 20. In fact, the public interest strongly

weighs *against* the requested relief, and this fact alone is sufficient to deny Plaintiffs' motion. *See id.* at 23–24 (declining to undertake a separate analysis of likelihood of success on the merits because "proper consideration" of public interest and equitable factors "alone require[d] denial of the requested injunctive relief").

80.     The equities favor the NYAG. As the Supreme Court has explained, the balance of the equities and the public interest merge when the Government is the opposing party. *Nken*, 556 U.S. at 435.

81.     That is particularly so here where the NYAG seeks to investigate violations of anti-fraud and consumer protection laws designed to protect New York consumers. Pursuant to Executive Law § 63(12) and General Business Law §§ 349, 350, the NYAG has the authority to investigate business practices that are potentially deceptive, fraudulent, or illegal, including through the issuance of documentary and testimony subpoenas prior to commencement of any enforcement action.

82.     The NYAG's investigation into the marketing and sales of these Kits implicate substantial state interests in safeguarding public health and safety. The NYAG's aim is to ensure the protection of survivors of sexual assault and the effective prosecution of sex crimes. *See Jaffery v. Atl. Cnty. Prosecutor's Off.*, 695 F. App'x 38, 40–41 (3d Cir. 2017) (noting the "important state interest in prosecuting criminal behavior"); *Artway v. Att'y Gen. of State of N.J.*, 81 F.3d 1235, 1267 (3d Cir. 1996) ("Protecting vulnerable individuals from sexual offenses is certainly a legitimate state interest."); *Juzwin v. Asbestos Corp., Ltd.*, 900 F.2d 686, 689 n.2 (3d Cir. 1990) (noting that "public health [and] safety" are considered "peculiarly strong" state interests); *Heffner v. Murphy*, 745 F.3d 56, 92 (3d Cir. 2014) (state's "articulated interest in consumer protection is undoubtedly substantial").[13]

---

[13] Moreover, as noted above, federalism concerns are implicated when a court is asked to enjoin government officials from a sister state acting pursuant to that state's own laws. *See, e.g., Wercinski,* 513

83.     The investigation "advances these [substantial] interests in a direct and material way[,]" *Edenfield v. Fane*, 507 U.S. 761, 767 (1993), because Plaintiffs' marketing and positioning of their product as an alternative to a forensic SANE exam misleads survivors (who might otherwise have accessed a SANE exam) into using a product which will: not hold up in court, thus hindering prosecution of sex crimes; leave gaps in urgent needs fulfillment for survivors immediately following an assault; and potentially further reduce accountability for perpetrators of sexual assault. These are just a few reasonably foreseeable effects of Plaintiffs' marketing of their product, all of which go to the heart of the NYAG's interests in this case.

84.     The Court finds that the NYAG's attempt to evaluate and potentially prevent these harmful effects through investigating Plaintiffs' marketing activity and sales of this product directly advances the state's "peculiarly strong" interests in preserving public health and safety. *Juzwin*, 900 F.2d at 689 n.2.[14] In contrast, Plaintiffs do not have a legitimate interest or constitutional right to short-circuit an ongoing investigation into their conduct.

85.     The Court also finds that even assuming the investigation constitutes a "restriction on protected speech[,]" such restriction "is in reasonable proportion to the interests served" in this case. *Edenfield*, 507 U.S. at 767. The interests implicated here are weighty ones and, given the profound interests at stake, the NYAG's continued investigation into Plaintiffs' practices is warranted to protect

---

F.3d at 487 (opining that state officials should not "have to defend [their] attempt to enforce [state] laws in courts throughout the nation").

[14] The cases relied upon by Plaintiffs in their PI Motion are distinguishable from the situation presented here. For example, in *Stilp v. Contino*, 743 F. Supp. 2d 460 (M.D. Pa. 2010), the court held that the statute at issue constituted a blanket prohibition on speech that was overly broad to achieve the government's interest. Among other bases, the court found that because the state agency had alternative means of investigating and sanctioning frivolous complaints filed with the Ethics Commission—including referral to the state attorney general—the statute was cumulative and unnecessary to protect the public interest. In contrast, the NYAG's investigation is not unnecessary; it is aimed squarely at protecting the public health and survivors of sexual assault in particular.

the public, and sexual assault survivors in particular. In sum, the equitable and public interest considerations at issue here weigh strongly against the requested relief.

## CONCLUSION

For all of the foregoing factual and legal reasons, as well as those more fully set forth in the NYAG's papers submitted in opposition to Plaintiffs' motion for a preliminary injunction and in support of the NYAG's motion to dismiss, the NYAG respectfully requests that the Court grant the NYAG's motion to dismiss, deny Plaintiffs' request for a preliminary injunction as moot, and dismiss the case in its entirety as it pertains to the NYAG.

Dated:  New York, New York
        September 17, 2024

                                        Respectfully submitted,


                                        LETITIA JAMES
                                        Attorney General
                                        State of New York

                                        By: */s/ Rosemary B. Boller*
                                        Rosemary B. Boller (#1929850)
                                        Assistant Attorney General
                                        28 Liberty Street
                                        New York, NY 10005
                                        Tel: (212) 416-6287
                                        Rosemary.Boller@ag.ny.gov

                                        By: */s/ Haley L. Hawkins*
                                        Haley L. Hawkins (#5775028)
                                        Assistant Attorney General
                                        28 Liberty Street
                                        New York, New York 10005
                                        Tel: (212) 416-8771
                                        Haley.Hawkins@ag.ny.gov